**INTERNATIONAL CABLEVISION, INC.**
**d/b/a Adelphia Cable, Plaintiff,**

v.

**Marvin NOEL, Defendant.**

**No. 91–CV–0449C.**

United States District Court,
W.D. New York.

Aug. 1, 1994.

Daniel J. Lefkowitz, Jericho, NY, for plaintiff.

Brown & Kelly (Rodney O. Personius, of Counsel), Buffalo, NY, for defendant.

CURTIN, District Judge.

Plaintiff International Cablevision Inc., d/b/a Adelphia Cable ("Cablevision"), brought this action against defendant Marvin Noel seeking damages and injunctive relief, claiming that Noel sold electronic devices designed to permit unauthorized interception and decoding of Cablevision's cable television programming signal, in violation of 47 U.S.C. §§ 553(a)(1) and 605(e)(4).[1] Cablevision has moved for summary judgment. Noel concedes the § 553 violation; however, he has moved to dismiss the § 605 claim.

After the parties' original briefs were filed, the Second Circuit decided *International Cablevision, Inc. v. Sykes*, 997 F.2d 998 (2d Cir.1993). In that decision, the Second Circuit discussed the relationship between §§ 553 and 605 in some detail, and expressed reservations about the applicability of § 605 in cases which, like the present one, involve the theft of television signals transmitted by coaxial cable. *Id.* at 1007–1009. It did not, however, rule on the issue. On July 14, 1993, this court ordered the parties in the present case to file additional briefs on the applicability of § 605 in the light of *Sykes*. Both parties have done so.

### *FACTUAL BACKGROUND*

Cablevision provides cable television programming to residents of Erie and Niagara Counties through franchises awarded by various villages, towns and municipal governments. Pursuant to the franchise agreements, the company extends its system to reach each person requesting service. Its programming includes "basic cable service" and "premium" channels. Basic service is a package of channels a subscriber receives for a minimum flat rate. Premium programming, which includes channels such as Pay–per–View, Cinemax, HBO, and Showtime, is provided for a higher fee.

Basic service and premium signals are transmitted simultaneously to subscribers'

homes via a coaxial ground cable. A device known as a "converter" converts the multiple signals into a form that can be viewed through a subscriber's television set. To prevent subscribers from receiving cable services for which they have not paid, Cablevision scrambles the signals for premium channels. These signals must be descrambled by the use of device known as a "descrambler" or "decoder" which is either attached to or incorporated into the subscriber's converter. Converter/decoder units are provided to subscribers as part of the monthly charge for cable service. In this way, Cablevision can determine which services each subscriber receives. It is the primary method by which the company prevents subscribers from gaining access to programming for which they have not paid.

Cablevision's contracts with its subscribers forbid unauthorized tampering with its equipment. Nevertheless, it is possible for a subscriber to remove a converter/decoder unit and replace it with one capable of decoding all of the company's coded programming. Thus, a subscriber paying only for basic service may gain access to premium programming by installing a unit from a source other than Cablevision.

On April 9, 1991, Marvin Noel sold a Scientific Atlanta descrambler that he had obtained from a company in Chicago, Illinois, to Ann Crowley and Darleen Lake, investigators for Cablevision. He explained to the investigators how to attach the unit to their existing cable and television connections, and stated that so long as they paid for Cablevision's basic service, they would be able to receive premium programming without having to pay for it. Cablevision tested the unit, and found that it could indeed descramble premium programming on a television receiving only the company's basic service.

Noel sold a second Scientific Atlanta descrambler to Crowley and Lake on April 18, 1991. Unbeknownst to Noel, the investigators made a tape recording of the conversation that took place at that time. During the conversation, Noel again explained how to connect the descrambler, and told the inves-

---

1. Any person aggrieved by a violation of § 553(a)(1) or § 605(e)(4) may bring a civil action in a United States district court under 47 U.S.C. § 553(c)(1) or § 605(e)(3)(A).

tigators to be careful about who they talked to about the unit, to hide it from the cable company, and that it was "illegal."

### DISCUSSION

1. *Defendant's Liability under §§ 553 and 605*

■ Cablevision contends that by selling descramblers intended for use in the unauthorized reception of its premium programming, Noel violated both 47 U.S.C. § 553(a) and 47 U.S.C. § 605(e)(4). Noel concedes that he violated § 553, which provides that:

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553(a). He maintains, however, that his conduct was not covered by § 605(e)(4). The question of liability under § 605(e)(4) is material, because the Second Circuit has indicated that if § 605(e) is applicable in cases such as this one, district courts should award damages under that section rather than the lesser damages available under § 553. *International Cablevision, Inc. v. Sykes*, 997 F.2d at 1009. Further, where a plaintiff prevails on a § 605(e) claim, the court *must* award reasonable attorneys' fees, whereas if it is shown that the defendant violated only § 553, the court may, but is not required to, award such fees. *Id.* at 1009–1010; 47 U.S.C. §§ 553(c)(2)(C) and 605(e)(3)(B)(iii).

Section 605(e)(4) establishes that it is a violation for any person to sell or distribute:

any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming,

or is intended for any other activity prohibited by subsection (a) of this section.

47 U.S.C. § 605(e)(4). Section 605(a), in turn, provides in pertinent part that:

no person receiving, assisting in receiving, transmitting or assisting in transmitting, any interstate or foreign communication by wire or by radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee ... No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). Thus, in order to determine whether Noel violated § 605(e)(4), I must decide whether the descramblers he sold were either (i) "primarily of assistance in the unauthorized decryption of satellite cable programming," or (ii) intended for use in any of the various other activities prohibited by 47 U.S.C. § 605(a). This requires interpretation of the language of §§ 605(e)(4) and 605(a) in the context of their legislative history, and of the legislative history and enactment of § 553.

■ Congress enacted both § 553 and the provision that ultimately became § 605(e)(4) as part of the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, 98 Stat. 2779 *et seq.* ("the Cable Act"), which amended the Communications Act of 1934 ("the Communications Act"), 47 U.S.C. § 151 *et seq.* Section 553 was intended to deal specifically with the problem of "'theft of cable service,' including 'gaining access to premium movie and sports channels without paying for the receipt of those services.'" *International Cablevision v. Sykes*, 997 F.2d at 1003 (*quoting* H.R.Rep. No. 934, 98th Cong., 2d Sess. 83 (1984), *reprinted in* 1984 U.S.Code Cong. & Admin.News

("U.S.C.C.A.N.") 4655, 4720). The legislative history makes it clear that § 553(a)(2) was "primarily aimed at preventing the manufacture and distribution of so-called 'black boxes' and other unauthorized converters which permit reception of cable service without paying for the service." H.R.Rep. No. 934, at 84, *reprinted in* 1984 U.S.C.C.A.N. at 4721. Thus, § 553(a) was plainly intended to encompass the kind of conduct engaged in by Noel. *International Cablevision, Inc. v. Sykes,* 997 F.2d at 1000–1005; *United States v. Norris,* 833 F.Supp. 1392, 1393–1394, 1398 (N.D.Ind.1993).

At the same time as providing for the protection of services offered over a cable system in § 553, the Cable Act made substantial amendments to § 605 of the Communications Act, 47 U.S.C. § 605. Pub.L. No. 98–549, § 5, 98 Stat. at 2802–2803. The existing § 605 was retained without alteration as § 605(a), and four new subsections, designated as subsections (b)–(e), were added. *Id.* The new provisions were intended to address:

> the growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations, as well as the increasing need to adopt stronger penalties and remedies for the unauthorized interception of signals prohibited under section 605.

130 Cong.Rec.S. 14,286, October 11, 1984 (Statement of Senator Packwood), *reprinted in* 1984 U.S.C.C.A.N. at 4745. Subsection (d) established criminal sanctions and civil penalties for violations of § 605(a), and provided an explicit right of action for any person aggrieved by a violation of that section. Subsection d(4) stated that:

> [t]he importation, manufacture, sale or distribution of equipment by any person with the intent of its use to assist in any activity prohibited by subsection (a) shall be subject to penalties and remedies under this subsection to the same extent and in the same manner as a person who has engaged in such prohibited activity.

Pub.L. 98–549, § 5(d)(4), 98 Stat. at 2903. Subsection (d) was redesignated as subsection (e), and the language of the former subsection (d)(4) replaced with the current language of subsection (e)(4), in 1988. Pub.L. 100–626, 102 Stat. 3211 (1988); Pub.L. 100–667, § 205(12) (1988), 102 Stat. at 3960.

Prior to passage of the Cable Act in 1984, several courts had interpreted § 605 as affording protection to television services transmitted via coaxial cable. *Ciminelli v. Cablevision,* 583 F.Supp. 158, 161 (E.D.N.Y. 1984); *Cablevision v. Annasonic Electronic Supply, et al.,* No. CV–83–5159 (E.D.N.Y. February 10, 1984) (Altimari, J.) (decision not published, but appended, in part, to *Ciminelli v. Cablevision,* 583 F.Supp. at 163–164); *Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. 376, 380 (N.D.Ohio 1983); *Porter County Cable Co., Inc. v. Moyer,* 624 F.Supp. 1, 2–3 (N.D.Ind.1983). Cablevision contends that these cases were decided correctly, and that enactment of the Cable Act did nothing to affect the applicability of the former § 605, which was retained unaltered as § 605(a), to theft of cable services. I disagree, for two reasons. First, the statutory language itself fails to establish that § 605(a) prohibits the interception and decryption of television signals transmitted via cable. And second, interpretation of § 605(a) as encompassing the theft of cable-borne signals would render Congress' enactment of § 553 superfluous, and would require an unnecessarily strained reading of the legislative history of §§ 553 and 605(e)(4).

Each of the first three sentences of § 605(a) had, prior to passage of the Cable Act, been relied upon by courts in finding that § 605 afforded protection to cable-borne television signals. Not one of these sentences, however, is obviously applicable. Cablevision maintains that the relevant language is contained in the second and third sentences, which provide that:

> [n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communica-

tion (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). Plainly, these provisions should only be held applicable if the terms "radio communication" and "communication by radio" can properly be interpreted to include cable-borne signals. The Communications Act, however, clearly distinguishes between "wire communication" or "communication by wire," which includes the transmission of signals "by aid of wire, cable, or other like connection between the points of origin and reception of such transmission," and "radio communication" or "communication by radio," which means the transmission of signals by radio. 47 U.S.C. § 153(a), (b). Cablevision's cable-borne signals certainly fall within the definition of "wire communications," but are not obviously encompassed by the term "radio communications." I recognize that the term "radio communication" includes "services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." 47 U.S.C. § 153(b). But Cablevision does not argue, and there is no reason to hold, that its cable-borne signals may be regarded as *incidental to* radio transmissions.

All of the pre-Cable Act cases holding that cable-borne television signals were protected under § 605 relied, at least in part, on the language of the second and third sentences of that section, and thus on the characterization of the signals as "radio communications." *Ciminelli v. Cablevision,* 583 F.Supp. at 161; *Cablevision v. Annasonic Electronic Supply, et al.,* 583 F.Supp. at 163–164; *Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. at 379–380; *Porter County Cable Co., Inc. v. Moyer,* 624 F.Supp. at 3.[2] Cablevision maintains that this reliance was properly based on

a recognition that there is no distinction between cable programming signals transmitted first "over-the-air" and then, after receipt by cable operators, "over-the-wire" to subscribers. In support of its position, it cites the following passage from *Cablevision v. Annasonic Electronic Supply, et al.:*

> The premium services offered by plaintiffs, such as HBO, are transmitted by interstate radio communications and then relayed to subscribers by means of coaxial cable. While the theft of services by way of unauthorized descramblers occurs at the subscriber's home and not at the cable headend, the theft is nevertheless of an interstate radio transmission.

583 F.Supp. at 163–164. Insofar as this analysis completely disregards the clear distinction made in 47 U.S.C. § 153 between radio and wire communications, I respectfully disagree with it.[3]

The second and third sentences of § 605 were amended in 1968, by insertion of the word "radio" before "communication" in the second sentence, and by elimination of the words "wire or" preceding the word "radio" in the third sentence. Pub.L. 90–351, § 803 (1968). These amendments make it clear that Congress did not intend the provisions to apply, after 1968, to wire communications. *See Dunn v. Blue Ridge Telephone Co.,* 868 F.2d 1578, 1581, n. 12, *reh'g granted,* 888 F.2d 731, *remanded for dismissal on grounds that the case had settled,* 888 F.2d 731, 732 (11th Cir.1989). The changes were enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968, at the same time that Congress enacted the Wiretap Act, 18 U.S.C. § 2510 *et seq.,* which was intended to govern, from that time, the interception of wire and oral communications. *See* S.Rep.

**2.** In *Porter County Cable Co., Inc. v. Moyer,* the court quoted the language of § 605 incorrectly, including the words "wire or" before the word "radio" in the third sentence. 624 F.Supp. at 3.

**3.** Cablevision also cites *United States v. Southwestern Cable Co.,* 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), in support of the proposition that programming signals which cable television operators first receive at a satellite dish and then retransmit over coaxial cable to subscribers represent a "stream of communication [that] is essentially uninterrupted and properly

indivisible." *Id.* at 169, 88 S.Ct. at 2001. The Supreme Court's observation was made in the context of a determination that community antenna television (CATV) systems, which "receive the signals of television broadcasting stations, amplify them, transit them by cable or microwave, and ultimately distribute them by wire to the receivers of their subscribers," *Id.* at 161, 88 S.Ct. at 1997, are engaged in interstate communication. The Court did not in any way suggest that wire-borne and radio signals are indistinguishable for regulatory purposes.

No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2153, 2196–2197 (1968). In *Cablevision v. Annasonic Electronic Supply, et al.,* Judge Altimari indicated that he had reviewed the legislative history of the Wiretap Act, and "found no intent within that statute to cover the area of theft of cable television services." 583 F.Supp. at 164. He concluded that he should therefore construe § 605 as protecting such services. Again, I cannot concur. I have been unable to find any indication in the legislative history of the 1968 Act that Congress gave any consideration to the question of the theft of cable television signals, or that it intended such signals to be protected from unauthorized interception under the amended § 605, at that time.

Unlike the second and third sentences of § 605(a), the first sentence refers to both radio and wire communications. It provides, in pertinent part, that:

> no person receiving, assisting in receiving, transmitting or assisting in transmitting, any interstate or foreign communication by wire or by radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee ...

47 U.S.C. § 605(a). The explicit reference to communications "by wire or by radio" makes it even clearer that while the first sentence of § 605(a) was intended to protect wire-borne signals, the second and third sentences were not.

■ I do not interpret the first sentence of § 605(a) as affording protection against the unauthorized interception or receipt of wire, or indeed of any, communications. Unlike the second and third sentences, it makes no reference to such activity. Interpreting it as protecting against the unauthorized interception or receipt of *wire* communications would be contrary to Congress' intent in amending the second and third sentences of § 605 in 1968. *See supra.* Similarly, interpreting it as protecting against the unauthorized interception or receipt of *radio* communications would render the second and third sentences superfluous. Furthermore, the

legislative history of the 1968 amendments makes it clear that the first sentence of § 605 was intended to regulate the conduct of *communications personnel*—*i.e.,* those legitimately involved in transmitting or receiving radio or wire communications—rather than to address the problem of unauthorized interception or reception of communications. S.Rep. No. 1097, *reprinted in* 1968 U.S.C.C.A.N. at 2197; *see Edwards v. State Farm Insurance Co.,* 833 F.2d 535, 540 (5th Cir.1987). Thus, to the extent that the courts in *Ciminelli v. Cablevision,* 583 F.Supp. at 161, *Cablevision v. Annasonic Electronic Supply, et al.,* 583 F.Supp. at 164, and *Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. at 380, relied upon the first sentence of § 605 in holding that § 605 affords protection against the unauthorized descrambling of cable-borne television signals, I must again respectfully disagree with their conclusions.

When the pre-Cable Act cases were decided, § 553 had not yet been enacted, and there may have been no federal statute besides § 605 that arguably covered the theft of cable-borne television signals by the use of descramblers. *United States v. Norris,* 833 F.Supp. at 1400; *Cablevision v. Annasonic Electronic Supply, et al.,* 583 F.Supp. at 164. The courts "stretched the language of § 605 to apply to the advanced technologies of the 1980s." *United States v. Norris,* 833 F.Supp. at 1400 (citing *Air Capital Cablevision, Inc. v. Starlink Communications, Inc.,* 601 F.Supp. 1568, 1570–1571 (D.Kan.1985)). In enacting § 553 as part of the Cable Act, Congress addressed, for the first time, the problem of unauthorized interception and receipt of cable-borne television signals. As I have already noted, the legislative history makes it quite plain that § 553 was aimed specifically at affording cable operators protection from such conduct. Cablevision maintains, nevertheless, that the courts should continue to construe § 605(a) as being applicable in cases such as the present one. It is quite clear that Cablevision is wrong.

Cablevision relies on two passages from the legislative history of the Cable Act. It cites, first of all, the following statement by Rep. Wirth:

In amending existing section 605, it is intended to leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against piracy of protected communications. Over the years federal courts, consistent with Congressional intent, have recognized that section 605 provided broad protection against the unauthorized interception of various forms of radio communications. It is the Committee's intention to preserve these broad protections; that all acts which presently constitute a violation of present section 605 will continue to be unlawful under that section as amended.

\* \* \* \* \* \*

Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by way of new technologies ... This amendment made by section 5 of the bill is intended to preserve this broad reach of existing section 605 and to make clear that all communications covered under section 605 will continue to be protected under new section [605(a)].

130 Cong.Rec.H. 10,435, 10,439 (daily ed. October 1, 1984). Cablevision fails to recognize that this statement refers only to the intended effect of the proposed amendment of § 605 (*i.e.* the addition of subsections (b)–(e)), and not to the intended effect of the proposed enactment of § 553, on the reach of § 605.

Cablevision also relies on the following passage from the House Report:

Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. Nothing in [proposed § 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies

available under existing law for theft of service.

H.R.Rep. 934, at 83, *reprinted in* 1984 U.S.C.C.A.N. at 4720. This passage, when read in isolation, does seem to suggest that Congress believed that former § 605 had properly applied to the theft of cable-borne signals, and that it should continue to do so after the enactment of § 553. However, the House Report continued:

[Proposed § 553] sets forth a liability provision specifically applicable to theft of cable services offered over a cable system . . .

The Committee intends the phrase "service offered over a cable system" to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 *to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

H.R.Rep. 934, at 83, *reprinted in* 1984 U.S.C.C.A.N. at 4720 (emphasis added). This language provides strong support for the view that Congress meant that while § 605 would continue to govern the theft of air-borne signals intended for redistribution via cable, § 553, and *not* § 605, would govern the theft of cable-borne signals. *International Cablevision, Inc. v. Sykes,* 997 F.2d at 1008; *United States v. Norris,* 833 F.Supp. at 1400–1401, 1403–1404. Indeed, it would have been superfluous for Congress to enact § 553 if it intended that the theft of cable-borne signals was also to be governed by the amended version of § 605. *See United States v. Norris,* 833 F.Supp. at 1400–1401.[4]

4. In *Sykes,* the Second Circuit reviewed the similarities and differences in the civil enforcement provisions of §§ 553 and 605. *International Cablevision, Inc. v. Sykes,* 997 F.2d at 1007–1008. In so doing, it observed:

Both § 553 and § 605(e) were adopted as part of the [Cable] Act. In that Act, except for specifying that the statutory damages award was for "all violations" of § 553 as contrasted

with "each violation" of § 605 ... the civil remedy provisions were substantially identical. The monetary levels provided under both sections were the same. If § 553 had been intended to reach only conduct that was also prohibited by § 605, Congress might well not have set out the civil enforcement mechanisms separately. Further, in 1988, Congress substantially increased the penalty levels provided

■ In light of the above, I conclude that the unauthorized interception and descrambling of cable-borne television signals represents a violation of § 553(a)(1), but not of § 605(a). Thus, the sale of descramblers intended for use in the decoding of cable-borne television signals does not represent a violation of that part of § 605(e)(4) that prohibits the sale of any device or equipment, "knowing or having reason to know that [the device or equipment] ... is intended for any ... activity prohibited by [§ 605(a)]." 47 U.S.C. § 605(e)(4).

Cablevision contends that Noel violated § 605(e)(4) not only because the descramblers he sold were intended for use in an activity prohibited by § 605(a), but also because they fall under the definition of equipment "primarily of assistance in the unauthorized decryption of satellite cable programming." 47 U.S.C. § 605(e)(4). This argument is untenable. "Satellite cable programming" is defined in § 605(d) as "video programming which is *transmitted via satellite* and which is primarily *intended for the direct receipt by cable operators for their retransmission* to cable subscribers." 47 U.S.C. § 605(d)(1) (emphasis added). The plain meaning of this language is that the term refers to over-the-air satellite signals *before* their receipt by cable operators. It is clear that the signals must be *intended for receipt* by the operators; however, once they have been received and retransmitted to subscribers through coaxial cable, they no longer fall within the definition. *United States v. Norris,* 833 F.Supp. at 1398–1399.

Congress amended § 605(e)(4) to include the language referring to "satellite cable programming" in 1988, only four years after it enacted § 553. As the court observed in *Norris,* "[i]t would be superfluous for Congress to have intended § 605(e)(4) [as

amended in 1988] to cover the theft of cable services by use of unauthorized converter or 'black boxes' when Congress had enacted a law regulating the same subject matter four years prior." *United States v. Norris,* 833 F.Supp. at 1399.

Cablevision cites a number of cases decided after the passage of the Cable Act that have held or suggested that the sale of descramblers intended for use in the unauthorized interception of television signals transmitted via coaxial cable may violate § 605(e)(4), including *Oceanic Cablevision, Inc. v. M.D. Electronics,* 771 F.Supp. 1019, 1025 (D.Neb.1991), *Cablevision Systems Corp. v. De Palma,* 1989 WL 8165, *3 (E.D.N.Y.), and *Shenango Cable TV, Inc. v. Tandy Corp.,* 631 F.Supp. 835 (W.D.Pa 1986). These cases placed great reliance on the pre-Cable Act cases that had held § 605 to be applicable to the theft of cable-borne signals, and contained no analysis either of the statutory language of §§ 605(e)(4) and 605(a) or of the applicability of § 605 in the light of the enactment of § 553. In contrast, the court in *Norris* analyzed the interplay between §§ 553, 605(a) and 605(e)(4), and held that § 553(a), not § 605(e)(4), governs the theft of cable-borne television signals. *United States v. Norris,* 833 F.Supp. at 1397–1401, 1403–1404.[5]

In view of the statutory language of §§ 553, 605(a) and 605(e)(4), and of the legislative history of those provisions, I find that §§ 605(a) and 605(e)(4) are not applicable to Noel's conduct in this case. Accordingly, Cablevision's motion for summary judgment on its § 605 claim is denied, and Noel's cross-motion to dismiss that claim is granted.

**2.** *Relief under § 553*

*(a) Damages*

Cablevision seeks damages under 47 U.S.C. § 553(c)(2)(B) for Noel's conceded vio-

by § 605(e), *see* Pub.L. No. 100–667, § 205(9), 102 Stat. 3935, 3959–60 (1988); thus, if § 605 reaches all conduct prohibited by § 553, it is improbable that an aggrieved person would ever seek damages under § 553 rather than § 605. *Id.* at 1008.

**5.** Cablevision also attempts to derive support from decisions such as *Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d

829 (11th Cir.1990), *ON/TV of Chicago v. Julien,* 763 F.2d 839 (7th Cir.1985), *National Subscription Television v. S & H TV,* 644 F.2d 820 (9th Cir.1981), *Chartwell Communications Group v. Westbrook,* 637 F.2d 459 (6th Cir.1980), and *American Television and Communications Corp. v. Floken, Ltd.,* 629 F.Supp. 1462 (M.D.Fla.1986). These decisions are not on point, however, since they deal with the problem of unauthorized reception of over-the-air, not cable-borne, signals.

lations of § 553(a)(1). Computation of damages is governed by §§ 553(c)(3)(A)–(C).

■ Damages for a violation of § 553(a)(1) may be calculated by one of two methods. An aggrieved party may recover the actual damages suffered as a result of the violation, plus the amount of any profits obtained by the violator that are attributable to the violation but are not taken into account in computing actual damages. 47 U.S.C. § 553(c)(3)(A)(i). In the alternative, the aggrieved party may recover statutory damages for all violations involved in the action, in a sum of not less than $250 and not more than $10,000. 47 U.S.C. § 553(c)(3)(A)(ii).[6] Where the court finds that a violation was committed willfully and for purposes of commercial advantage or private financial gain, it may, in its discretion, increase a damage award by not more than $50,000. 47 U.S.C. § 553(c)(3)(B). On the other hand, where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of § 553, it may reduce the award to a sum of not less than $100. 47 U.S.C. § 553(c)(3)(C). *See International Cablevision, Inc. v. Sykes*, 997 F.2d at 1005–1006.

Cablevision states in its complaint that it cannot practically determine the actual damages it has suffered as a result of Noel's unlawful conduct. As a result, I can only compute damages by reference to the statutory damage provisions of §§ 553(c)(3)(A)(ii), 553(c)(3)(B) and 553(c)(3)(C).

■ Under § 553(c)(3)(A)(ii), the court has broad discretion to assess damages within the statutory limits, "as the court considers just." 47 U.S.C. § 553(c)(3)(A)(ii). One court has held that the factors to be taken into account in determining what damages are "just" include " 'the pecuniary loss sustained by the victim as a result of the offense, the financial resources of the defendant, … the financial needs and earning

ability of the defendant … as well as the burden that a damage award would impose on the defendant relative to the burden alternative relief would impose." *Cablevision Systems Corp. v. De Palma*, 1989 WL 8165 at *6 (quoting *Cablevision Systems Development Corp. v. Cohen*, CV–84–1155 (E.D.N.Y. May 20, 1988)). Citing this language, Noel urges that an award of no more than $250 per violation is justified, based upon his modest financial circumstances, the portrayal of himself as "a responsible, upstanding elderly citizen of a middle-income community," and the assertion that "a large damage award would be an unbearable burden … given his age, responsibility to a deaf and elderly wife and limited income." Item 12, pp. 8–9.

Cablevision argues, on the other hand, that the court should impose the maximum statutory damages available under § 553(c)(3)(A)(ii), because, it claims, Noel was "engaged in a substantial retail over the counter decoder business sales [sic]," and he directed a "concerted effort" against Cablevision. It maintains that such an award will act to prohibit Noel from "reaping the benefit of his criminal enterprise and encourage other cable operators to attack theft." Item 5, pp. 18–21.

■ My own reading of § 553(c)(3)(A)(ii) is that, since it provides for statutory damages as an alternative to a computation based on actual damages and violators' profits, determinations of what damages are "just" are most appropriately based, at least in the first instance, upon consideration of the likely pecuniary losses to the plaintiff and profits made by the violator. In this case, the record establishes that Noel sold two descramblers to Cablevision's agents, for a total of $600. There is no evidence to support Cablevision's assertion that he had engaged in a substantial retail business in decoder sales. Indeed, there is no hard evidence that he sold any more than the two descramblers he sold to the company's agents.[7] Cablevi-

---

6. Cablevision argues that under § 553(c)(3)(A)(ii), aggrieved parties are entitled to a separate award of statutory damages for *each* violation of § 553(a). This is clearly incorrect. *See International Cablevision, Inc. v. Sykes*, 997 F.2d at 1007 (comparing the language of § 553(c)(3)(A)(ii) with that of the parallel provi-

sion in § 605, § 605(e)(3)(C)(i)(II), which provides specifically for separate statutory damage awards for each violation).

7. The transcript of the conversation recorded between Noel and Cablevision's agents on April 18, 1991 indicates that Noel told the agents that

sion has not attempted to place any evidence in the record to establish the pecuniary loss it would be likely to suffer as a result of the illegal sale and use of two descramblers. Neither does the record establish how much Noel paid for the descramblers. I can only suppose that his profit would have been a good deal less than the $600 he received for them. On this basis, I find no reason to assess damages under § 553(c)(3)(A)(ii) at more than the statutory minimum of $250. Consequently, I do not need to decide whether it would be appropriate to consider, under § 553(c)(3)(A)(ii), the financial burden placed on Noel by an award of such damages.

Cablevision urges that the court increase the award of damages by $50,000 pursuant to 47 U.S.C. § 553(c)(3)(B), on the basis that Noel's violations were "committed willfully and for purposes of commercial advantage or private financial gain." Item 5, pp. 21–22; Item 16, ¶¶ 4–8. I find no reason to do so. Noel apparently told Cablevision's investigators that he did not make any money selling the descramblers, but that he "just like[d] to screw the cable company." Item 12, Ex. A. While this may suggest a certain willfulness, as does the clear evidence that Noel was fully aware of the illegality of the use of the descramblers,[8] it refutes the notion that the sales were made for purposes of commercial advantage or private financial gain. There is nothing in the record to establish that Noel's purpose was to profit financially from his descrambler sales.

Equally, I find no reason to reduce the award of damages pursuant to § 553(c)(3)(C), which provides for a reduction to not less than $100, in the court's discretion, "where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section." 47 U.S.C. § 553(c)(3)(C). There is evidence that Noel warned Cablevision's investigators that the use of the descramblers was illegal, that they should hide them from the cable company, and that they should be careful who they talked to about the units. Noel maintains that although he knew the use of the descramblers was illegal, he did not know that their sale was prohibited. However, while it is conceivable that he did not actually know that the sale of descramblers was unlawful, I find that his knowledge that their *use* was illegal gave him some reason, at least, to suspect that the sales may not have been legal. No reduction under § 553(c)(3)(C) is warranted.

(b) *Injunctive Relief*

Cablevision seeks an order pursuant to 47 U.S.C. § 553(c)(2)(A) enjoining Noel or anyone working for or with him from further sale, modification or distribution of electronic devices designed for unauthorized reception of its cable services. Under § 553(c)(2)(A), the court is authorized to grant temporary and final injunctions on such terms as it deems reasonable to prevent or restrain violations of § 553(a)(1). Under the circumstances of this case, I find that no injunctive relief is necessary to restrain Noel from committing further violations of § 553(a)(1). Cablevision's request for such relief is denied.

### CONCLUSION

Cablevision's motion for summary judgment under 47 U.S.C. § 553 is granted. Its motion for summary judgment on its 47 U.S.C. § 605 claim is denied. Noel's cross-motion to dismiss the 47 U.S.C. § 605 claim is granted. Statutory damages are awarded

---

"I don't sell that many, just once in a while." Item 16, Ex. A, p. 10.

**8.** The Supreme Court has defined "willful" in the context of a civil statute as conduct showing "disregard for the governing statute and an indifference to its requirements." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 127, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985) (citing *United States v. Illinois Central Railroad Co.*, 303 U.S. 239, 242–243, 58 S.Ct. 533, 535, 82 L.Ed. 773 (1938)). This standard has been applied in consideration of the willfulness of the theft of subscription television and satellite signals, for purposes of the enhancement of statutory damages under 47 U.S.C. § 605(e)(3)(C)(ii). *Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d at 851–852; *see also*, *ON/TV of Chicago v. Julien*, 763 F.2d at 844. *Cf. N.A.S. Import, Corp. v. Chenson Enterprises, Inc.*, 968 F.2d 250, 252 (2d Cir.1992) (for purposes of awarding enhanced statutory damages under the Copyright Act, 17 U.S.C. § 504(c)(2), an infringement is willful if the defendant had knowledge that its actions constituted infringement).

80

to Cablevision under 47 U.S.C. § 553(c)(3)(A)(ii), in the amount of $250.00.

So ordered.