**CABLEVISION SYSTEMS CORPORATION, et al., Plaintiffs,**

v.

**Can MUNEYYIRCI, a/k/a Jon Neyir, and Jon Meyer, et al., Defendants.**

**No. CV 90–2997 (RJD).**

United States District Court, E.D. New York.

Dec. 29, 1994.

---

Daniel J. Lefkowitz, Jericho, NY, for plaintiffs.

Bennete D. Kramer, Schlam Stone & Dolan, New York City, for defendants.

### MEMORANDUM & ORDER

DEARIE, District Judge.

Plaintiffs Cablevision Systems Corporation, et al., (hereinafter "Cablevision") brought this action alleging that defendants engaged in illegal sales of cable television equipment in violation of sections 553 and 605 of Title 47 of the United States Code. Chief Magistrate Judge Chrein conducted a three-day evidentiary hearing on Cablevision's application for a preliminary injunction and related relief. The Court subsequently adopted the recommendation of the Magistrate Judge and preliminarily enjoined the defendants from further sales and related activities by order dated February 6, 1991.

Thereafter, on April 26, 1991, Cablevision moved for summary judgment with respect to 2,609 sales.

This memorandum addresses two issues. First, the Court must determine to what extent Cablevision has established as a matter of law that defendants made illegal sales of cable equipment entitling Cablevision to summary judgment. Secondly, the Court must decide whether section 605, with its harsher statutory penalties, prohibits such sales.

Defendants concede 17 illegal sales that were the subject of testimony before the Magistrate Judge. The Court now concludes that defendants have failed to identify a genuine issue of material fact with respect to the legality of 373 additional sales and that plaintiff is therefore entitled to partial summary judgment with respect to 390 sales. The Court concludes after weighing all the relevant circumstances that the sum of $10,000 per sale is an appropriate measure of damages in this case.

## I. Background

Cablevision is licensed by various programming originators and distributors to receive television programming for distribution to its subscribers through a cable system. The programming originators transmit the programming via satellite to an earth station. The signals are then sent to Cablevision's "head-end", where they are converted into a form that can be transmitted through the cable system itself. Finally, the signals are relayed through the cable system to subscribers' homes.

Cablevision charges a monthly fee for its basic cable service and additional fees for access to premium channels such as HBO and the Disney Channel. Subscribers can also order "Pay–Per–View" services for individual events. All of the programming signals available on Cablevision's system are delivered to each household, regardless of the extent of the individual subscriber's service. Once the signals reach the subscriber's home, a converter modifies them into a form that can be viewed on a television set. To prevent subscribers from receiving cable programming for which they have not paid, Ca-blevision scrambles the signals for certain types of programming—generally, premium and "Pay–Per–View" channels. Cablevision provides subscribers with a decoder which is adjusted to descramble only the signals for which a subscriber has paid. The decoder is either attached to the converter or incorporated into the converter as a combination unit.

Unscrupulous cable customers are able to gain access to programming they have not paid for by purchasing pirate decoders, combination units, or converters that have been illicitly modified to descramble signals. The sale of such equipment is illegal if the seller knows the equipment is to be used to access scrambled programming without payment.

On August 24, 1990, plaintiffs began this action and by Order to Show Cause sought a preliminary injunction against defendants' continued sale of devices used to descramble Cablevision's cable signals without payment, claiming that defendants' conduct violated sections 553 and 605 of Title 47 of the United States Code. Plaintiffs seek permanent injunctive and monetary relief.

On September 27, 1990, Chief Magistrate Judge Chrein issued a Report and Recommendation, finding that there was "ample evidence to establish that both defendants [Jon Neyir and Rita DeGirmenci] knowingly and willfully sold devices to persons who sought to use those devices and who announced their intention to use these devices to circumvent the blocking that was done by the cable companies to prevent the receipt of unpaid for services." (Tr., 9/27/90 at 214). The Magistrate Judge recommended that this Court authorize the seizure of any decoder or other device that had been adapted to descramble signals, enjoin the sale of the same, and enjoin the modification of any converter that would render it capable of descrambling. On October 4, 1990, the Court authorized the seizure of defendants' stockpiles of decoding equipment, pending further consideration of Chief Magistrate Judge Chrein's Report and Recommendation. The Court adopted the Magistrate Judge's Report and Recommendation and granted

the preliminary injunction by order dated February 6, 1991.

Plaintiffs moved for summary judgment on April 26, 1991. On June 21, 1991, the Court heard arguments on the summary judgment motion and indicated that it would grant summary judgment with respect to an undetermined number of sales. The Court invited further submissions regarding liability and reserved decision on the issue of damages.

The Court now addresses the issues of summary judgment and damages and the related question of statutory interpretation.

## II. Summary Judgment

■ Defendants concede their liability for 17 illegal sales of decoders (Tr., 6/21/91 at 2; Defendants' Memorandum in Opposition to Summary Judgment at 2). Cablevision, however, seeks summary judgment and statutory damages with respect to an additional 2,609 mail order sales of cable equipment by defendants during the two year period August 1988 to August 1990.[1] Cablevision has tendered persuasive evidence that there is no legitimate retail market for decoders or combination units since these units are provided by cable companies as part of the cable service. Accordingly, Cablevision claims that all retail sales of such devices must be illegal. Cablevision insists that the inference of illegality is inescapable given the defendants' very incriminating admissions to undercover agents and operatives concerning illegal sales, evidenced during the preliminary injunction hearing, as well as the defendants' utter failure to proffer any evidence of legitimate sales at any time in opposition to the summary judgment motion.

Critical to the analysis is the uncontroverted evidence presented to the Magistrate Judge regarding a relatively small number of blatantly illegal decoder sales. Enhanced by Rita DeGirmenci's and Jon Neyir's damaging admissions to agents of the Federal Bureau of Investigation and others,[2] the evidence of

---

1. 2,609 is the number contained in the affidavit of Henry Hack submitted by Cablevision on April 17, 1991. The number is based on the invoices recovered during a search of Video–Link.

 In the extensive submissions that have followed Cablevision's motion for summary judgment, the number of sales has varied, but the Court has chosen to use the original number for the purposes of this analysis. The Court understands that the 2,609 figure includes not only the decoders and combination units, but also equipment related to their use, such as coaxial wire, remotes, filters, antennas and the like.

2. The transcript of the preliminary injunction hearing reveals numerous incriminating admissions by Rita DeGirmenci, Jon Neyir and David Sarjue, the sales manager of Stargaze.

 For example, when Harry Maxwell, Security Director of Cablevision of New York City, acting undercover, was ordering a decoder from DeGirmenci over the phone, he asked her about the disclaimer in the Video–Link advertisement that stated that a purchaser was supposed to notify his cable company when he received descrambling equipment from Video–Link. According to Maxwell, DeGirmenci laughed and responded, "well, you're supposed to notify your cable company." Maxwell said "I understand what you are trying to say" and DeGirmenci responded, "okay, you have it." (Tr., 9/17/90 at 223).

 Cablevision's investigator, Thomas Allen, testified at the preliminary injunction hearing that he spoke to DeGirmenci over the phone and said he wanted a way to lower his cable bills. DeGirmenci told him that she could sell him devices which would enable him to receive all of the channels offered by his cable company. When Allen expressed concern over the $185 she was asking for the equipment, she asked how much it would cost him to get all of the channels through the cable company. When he said $60 a month, she said, "there you have it; in three months you will be even already." (Tr., 9/17/90 at 198–199).

 During an FBI search of Video–Link on August 22, 1990, Special Agent Garfinkel asked DeGirmenci if the business was legal and she replied, "I don't think so." Sept. 22, p. 326.

 On April 23, 1990, Agent Vogel made undercover purchases directly from Jon Neyir. When he asked whether possession of the decoders was illegal, Neyir said yes, but added that Vogel would "never get caught" because "the cable company is afraid to do anything about it." (Tr., 9/27/90 at 79–80).

 Agent Vogel purchased a decoder at Stargaze from David Sarjue on April 10, 1990. Sarjue explained to Vogel that the box would enable him to receive premium channels while paying only for basic cable. (Tr., 9/27/90 at 19). Furthermore, when Vogel asked Sarjue if it was illegal to use the decoders, Sarjue laughed and said, "yes, but you will never get caught." (Tr., 9/27/90 at 58).

 Finally, during an FBI search of Stargaze on August 22, 1990, Agent Forbes asked Sarjue what Stargaze did and Sarjue replied that they sold converter boxes which "enabled someone getting basic cable service to attach it to the

undercover purchases paints a vivid picture of an extensively, if not exclusively, illegal operation.

Most telling is the defendants' failure to challenge plaintiff by introducing *any* evidence suggesting certain sales were legal— not one invoice, not one purchaser, not one affidavit, not one record of any kind establishing legitimate sales to an authorized distributor, or anyone. And when plaintiffs turned to the defendants Neyir and DeGirmenci for their explanations, these defendants invoked their fifth amendment privilege against self-incrimination.

Essentially, the issues are as follows: whether uncontested evidence of fraudulent intent with respect to at least 17 sales by defendants Stargaze and Video–Link over a limited period of time is sufficient to support an inference that extensive sales of decoders or combination units were made with similar intent, and if so, whether such an inference is so compelling that the Court can conclude that no genuine issue of material fact exists and plaintiff is entitled to judgment as a matter of law.

█ In *Anderson v. Liberty Lobby, Inc.,* the Supreme Court emphasized that, once the moving party has properly supported its motion for summary judgment, Rule 56(e) requires the nonmoving party to proffer evidence to establish that a reasonable jury could rule in his favor: "The movant has the burden of showing that there is no genuine issue of fact, but the [nonmovant] is not thereby relieved of his own burden of producing in turn evidence that would support a jury verdict." 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). *See also, Addickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 287, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). The nonmovant may not rest solely on the allegations or denials in his pleading; he must present specific facts showing that there is a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e). *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2514.

The defendants have simply not produced any evidence of legitimate sales of decoders or combination units. Their failure to present any evidence of legitimacy, in the face of Cablevision's convincing presentation, including evidence that there is no legitimate retail market for the decoders and combination units, leads the Court to conclude that there is no genuine issue of fact with respect to the legitimacy of sales of single decoders or combination units to individuals.

Admittedly, the Court's decision to limit summary judgment to sales of single devices may appear somewhat arbitrary, particularly in the face of such evidence and the defendants' telling demurrer. Nevertheless, the Court is aware of the drastic nature of summary judgment and must at the same time acknowledge the possibility, however improbable, that certain sales of more than single devices may have been accomplished under circumstances that leave the intent of the sellers somewhat in doubt.

With counsel's assistance, the Court has identified 373 sales of single decoders or combination units to purchasers residing within Cablevision's authorized franchise areas, in addition to the 17 sales that defendants concede were illegal. With respect to these 390 sales, the Court concludes that defendants have failed to demonstrate any genuine issue of material fact regarding their legitimacy and that Cablevision is entitled to judgment thereon.[3]

## III. *Applicability of Section 605*

The only remaining question is the measure and amount of statutory damages to

cable outlets in order to get premium channels without paying for it." (Tr., 9/27/90, at 120–21).

3. Facts similar to the ones at bar have been held to be sufficient grounds for summary judgment. *See Cable/Home Communication Corp. v. Network Productions, Inc.,* 902 F.2d 829, 849 (11th Cir. 1990) (affirming grant of plaintiff's motion for summary judgment for violations of section 605 where undisputed facts were established concerning defendants' open promotion and sale of

pirate chips, which enabled display of programming intended for paying subscribers only); *Porter Cty. Cable Co. v. Moyer,* 624 F.Supp. 1, 6 (N.D.Ind.1983) (granting plaintiff's motion for summary judgment for violations of section 605 where the pleadings, affidavits, exhibits, and depositions showed that defendants sold and made electronic decoders available to cable subscribers).

which Cablevision is entitled. There are arguably two statutory provisions that prohibit defendants' conduct—47 U.S.C. § 553(a)(1) and 47 U.S.C. § 605(e)(4). As a preliminary matter, it is clear that the sale of the decoders violated section 553(a)(1). Cablevision contends, however, that the defendants' actions violated section 605(e)(4) as well. The Court must therefore examine section 605 to determine whether defendants' conduct violated section 605(e)(4), thereby triggering section 605's more severe statutory damages provision.

Section 605(e)(4) makes it illegal for any person to sell or distribute:

any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section.

The first issue presented is whether the decoders and combination units the defendants sold were "intended for any other activity prohibited by subsection (a)" of section 605.

Section 605(a) provides in relevant part that:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

The pivotal question is whether the terms "radio communications" and "communication by radio" used in section 605(a) include cableborne television signals. In order to answer this question, an examination of the complex and at times confounding history of sections 605(a), 605(e)(4) and 553 is required.

Section 605(a) was passed in its original form as part of the Communications Act of 1934, 47 U.S.C. § 151 et seq. (the "Communications Act") and was originally the full text of section 605. Sentences two and three of section 605 initially read:

[N]o person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person; and no person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by wire or radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto; ...

The language of section 605 remained untouched until Congress passed the Omnibus Crime Control and Safe Streets Act of 1968. In Title III of that Act, Congress enacted the Wiretap Act, 18 U.S.C. §§ 2510 et seq. The Wiretap Act addressed the problems of unauthorized wiretapping and other interceptions of private oral conversations. Congress intended that the Wiretap Act would regulate the interception of wire and oral communications. *See* S.Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2153, 2196–2197 (1968). In deference to the newly enacted Title III, Congress substituted a new provision for the former section 605, deleting the reference to "communication by wire" in the third sentence. The second sentence of the new section 605 referred specifically to "any radio communication" instead of generally to "any communication" and the third sentence referred only to "communication by radio" rather than "communication by wire or radio." The new section 605 provided in pertinent part:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto ...

As the cable industry emerged and prospered during the 1970's and 1980's, two new

types of criminal appeared. The satellite pirate intercepts and decrypts scrambled airborne signals directly from the satellite feed using satellite dishes and illicit decoders, without the authorization of the programmer or payment for the programming. The cable pirate intercepts cable-borne television signals that have already been redistributed by cable company operators, using unauthorized decoders like the ones defendants sold in this case.

When courts first confronted the sale and use of unauthorized decoders in the early 1980's, they held, apparently unanimously, that the unauthorized interception of "radio communications" prohibited by section 605 encompassed the interception of television signals transmitted via cable. *See, Ciminelli v. Cablevision*, 583 F.Supp. 158, 161 (E.D.N.Y.1984); *Cablevision v. Annasonic Electronic Supply*, CV 83–5159 (E.D.N.Y. February 10, 1984) (Altimari, J.); *Cox Cable Cleveland Area, Inc. v. King*, 582 F.Supp. 376, 380 (N.D.Ohio 1983); *Porter County Cable Co., Inc. v. Moyer*, 624 F.Supp. 1, 2–3 (N.D.Ind.1983).

Responding to the advancing technologies in 1984, Congress squarely addressed the problem of cable theft for the first time in the Cable Communications Policy Act of 1984, Pub.L. No. 98–549, (the "Cable Act"). First, section 705 of the Cable Act made significant additions to section 605. The revised section 605 dealt largely with two issues:

[t]he growing practice of individuals taking down satellite delivered programming for private, home viewing by means of privately owned backyard earth stations, as well as the increasing need to adopt stronger penalties and remedies for the unauthorized interception of signals prohibited under section 605. 130 Cong.Rec. S14,286, October 11, 1984 (Statement of Senator Packwood), reprinted in 1984 U.S.C.C.A.N. at 4745.

Under section 705 of the Cable Act, section 605 remained unchanged but became section 605(a). Congress added 605(b), which legalized the sale and use of backyard satellite dishes by providing a limited exemption from liability under section 605(a) for individual satellite dish owners. It authorized individual satellite dish owners to receive unscrambled signals until programmers either scrambled the signals or created a marketing scheme that would enable dish owners to pay for the television signals they received.

The new section 605(c) defined terms used in section 605. The new section 605(d), which would later become section 605(e), provided criminal sanctions and civil penalties for violations of section 605(a) and provided a statutory right of action for parties aggrieved by a violation of section 605(a). Furthermore, section 605(d)(4) provided:

importation, manufacture, sale, or distribution of equipment by any person with the intent of its use to assist in any activity prohibited by subsection (a) of this section shall be subject to penalties and remedies under this subsection to the same extent and in the same manner as a person who has engaged in such prohibited activity.

This new subsection (d)(4) was enacted to ensure that the sellers as well as the users of equipment intended for the unauthorized interception of radio communications would be subject to penalties. As a result of this amendment, section 605(a) now prohibits the actual unauthorized interception of radio communications and section 605(e)(4) prohibits the sale of equipment knowing it will be used for such unauthorized interception.

In addition to the significant expansion of section 605, the Cable Act also created a new provision, 47 U.S.C. section 553, specifically to deal with theft of cable-borne signals. Section 553 provides in relevant part:

(a) (1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purposes of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manufacturer or distributor (as the case may be) for unauthorized reception of any communications service

offered over a cable system in violation of subparagraph (1).

When Congress initially passed the Cable Act, section 553 provided for statutory damages ranging from $250 to $10,000 for all violations, whereas section 605 provided for statutory damages ranging from $250 to $10,000 for each violation.

In the years following the passage of the Cable Act, courts continued to hold, or suggest in dicta, that section 605 applied to the unauthorized sale of decoders. *See ON/TV of Chicago v. Julien*, 763 F.2d 839 (7th Cir. 1985); *Shenango Cable TV, Inc. v. Tandy Corp.*, 631 F.Supp. 835 (W.D.Pa.1986); *Oceanic Cablevision, Inc. v. M.D. Electronics*, 771 F.Supp. 1019 (D.Neb.1991); *Cablevision v. Cohen*, 84 CV 1155 (E.D.N.Y. Apr. 21, 1988) (Korman, J.). None of those courts explored in detail, however, the effect of the Cable Act on the applicability of section 605 to that conduct.

In 1988, Congress passed the Satellite Home Viewer Act with the explicit purpose of ensuring the "availability of satellite-delivered video programming to home satellite antenna owners." H.R.Rep. No. 887(II), 100th Cong., 2d Sess. (1988), reprinted in 1988 U.S.C.C.A.N. at 5577. In an effort to achieve this goal, Congress passed several new amendments to section 605. They added a new subsection (c) entitled "Scrambling of Public Broadcasting Service programming" and redesignated the old definitional subsection (c) as subsection (d). They redesignated the old subsection (d), providing penalties and civil remedies, as (e). Moreover, they amended subsection (e)(4)—formerly (d)(4)—to expressly criminalize the manufacture, sale or distribution of devices or equipment with knowledge that their primary purpose is to assist in unauthorized decryption of satellite cable programming.

The revised section 605(e)(4) reads:

Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation ...

Most significantly, Congress severely stiffened the civil and criminal penalties for violations of section 605(a) and section 605(e)(4). The new section 605(e)(3)(C)(i)(II) increased the statutory damages available for each violation of section 605(a) to "not less than $1,000 or more than $10,000" and increased the statutory damages available for each violation of section 605(e)(4) to "not less than $10,000, or more than $100,000." Section 553, on the other hand, provides for total statutory damages of $250 to $10,000 for all violations. *See International Cablevision v. Sykes*, 997 F.2d 998, 1007 (2d Cir.1993). Accordingly, if the Court were to hold that only section 553 applied to defendants' conduct, the award of statutory damages would be limited to a maximum of $10,000. Moreover, while the award of costs and reasonable attorney's fees is mandatory under section 605, it is discretionary under section 553. Therefore, the question of whether the term "radio communications" in section 605(a) includes cable-borne television signals has obvious significance.

Two district courts have held recently that section 553 is the exclusive remedy for the sale and use of unauthorized decoders to intercept cable-borne television signals. Relying on the language of section 605(a) and the legislative history of the Cable Act, those courts have held that the unauthorized interception of "radio communications" under section 605(a) encompasses only the theft of airborne satellite signals and not the theft of service from the point at which it is actually being distributed over a cable system. *International Cablevision, Inc. v. Noel*, 859 F.Supp. 69 (N.D.N.Y.1994); *United States v. Norris*, 833 F.Supp. 1392 (N.D.Ind.1993); *see also International Cablevision, Inc. v. Sykes*, 997 F.2d 998 (2d Cir.1993) (suggesting that the district court on remand consider the possibility that section 605 does not apply to the theft of cable-borne signals). For the reasons set forth below, this Court disagrees.

The language of section 605(a) is unclear and is therefore not determinative. The two

pertinent sentences both refer to the interception of "radio communications" or "communication by radio." The question is whether signals initially transmitted as radio signals to cable operators and then redistributed via a cable system can be characterized under the statute as "radio communications."

Section 153(b) of 47 defines "radio communication" as:

the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

The above definition of "radio communications" neither plainly encompasses nor plainly excludes cable-borne television signals. It is arguable that, because such signals originate as radio transmissions, they can fairly be characterized as "radio communications." One of the first courts to hold that section 605 applies to the sale of unauthorized decoders relied on that reasoning:

First, defendants' argument assumes that the theft of cable television services does not encompass the theft or interception of radio communications. Yet, I believe it does. The premium services offered by plaintiffs, such as HBO, are transmitted by interstate radio communications and then relayed to subscribers by means of coaxial cable. While the theft of services by way of unauthorized descramblers occurs at the subscriber's home and not at the cable headend, the theft is nevertheless of an interstate radio transmission. The system of coaxial cable used to facilitate final delivery of the signal to subscriber homes, does not change the nature of the stolen transmission itself. *Cablevision v. Annasonic Electronic Supply,* CV 83–5159 (E.D.N.Y. February 10, 1984) (Altimari, J.).

Moreover, defendants do not even address whether the redistribution of the signals by the cable operators via cable constitutes a service "incidental" to the radio transmission, much less suggest that it does not. The meaning of the statutory language is not clear and therefore the Court turns to the

legislative history in an effort to gain some insight as to whether the term "radio communications" encompasses cable-borne television signals.

When Congress initially passed what is now section 605(a) as part of the Communications Act of 1934, they were certainly not contemplating cable television technology. Likewise, they were not considering cable technology when they passed the Omnibus Crime Control and Safe Streets Act in 1968, deleting references in section 605 to "wire communications" as an obvious accommodation to the new wiretap statute. Congress enacted the Wiretap Act as part of the Omnibus Act to protect the privacy of innocent persons, not to deter or punish cable theft. When courts first began to deal with the problem of theft of cable-borne television signals in the early 1980's, Congress had not yet addressed the problem of cable theft explicitly. Courts, however, found little difficulty interpreting "radio communications" in section 605(a) to encompass cable-borne television signals that originated as radio transmissions.

Congress addressed the growing problem of cable theft in the Cable Act of 1984:

The Committee recognizes that a number of states have enacted statutes which provide criminal penalties and civil remedies for the theft of cable service, and the committee applauds those efforts. Subsection (d) provides that laws enacted by a state or franchising authority dealing with this problem are not affected by this section, even if such laws impose higher penalties or sanctions than those set forth in this section. The committee believes that this problem is of such severity that the federal penalties and remedies contained herein must be available in all jurisdictions (and enforceable in state or federal court) as part of the arsenal necessary to combat this threat. H.R.Rep. No. 934, 98th Cong., 2d Sess., at 84 (1984), reprinted in 1984 U.S.C.C.A.N. at 4721.

It is important to note that, in discussing the amendments to section 605, Congress explicitly endorsed the decisions of the courts to apply section 605(a) to the unauthorized interception of cable-borne television signals:

Over the years federal courts, consistent with congressional intent, have recognized that section 605 provided broad protection against the unauthorized interception of various forms of radio communications. It is the committee's intention that the amendment preserve these broad protections; that all acts which presently constitute a violation of present section 605 shall continue to be unlawful under that section as amended ... Section 605 not only prohibits unauthorized interception of traditional radio communications, but also communications transmitted by means of new technologies. For example, existing section 605 provides protection against the unauthorized reception of subscription television (STV), multipoint distribution services (MDS), and satellite communications. This amendment made by section 5 of the bill is intended to preserve this broad reach of existing section 605 and to make clear that all communications covered under section 605 will continue to be protected under new section 705(a). 130 Cong.Rec. H10,435, 10,439 (daily ed. October 1, 1984).

The second to last sentence in this passage indicates that Congress did not intend that, after the passage of section 553, section 605(a) would cover only the unauthorized interception of air-borne satellite communications. They intended that section 605 would also provide protection against the "unauthorized reception of subscription television"—precisely the behavior the defendants sponsored and encouraged in this case.

One House Report concerning the proposed section 553 expressed the same sentiment in the following instructive language:

The Committee is extremely concerned with a problem which is increasingly plaguing the cable industry—the theft of cable service. This problem has taken on many forms [including] the manufacture and sale of equipment intended to permit reception of cable services without paying for it ... Existing section 605 of the Communications Act of 1934 includes a prohibition against the unauthorized reception of communications services. Nothing in this section is intended to affect the applicability of existing section 605 to theft of cable service, or any other remedies available under existing law for theft of service. H.R.Rep. No. 934, 98th Cong., 2d Sess., at 83 (1984), reprinted in 1984 U.S.C.C.A.N. at 4720.

In *International Cablevision v. Noel*, the court downplayed the significance of this seemingly unequivocal language in holding that section 605 does not apply to cable theft. *See Noel*, 859 F.Supp. at 76. The court chose to emphasize the language that followed in the same House Report:

[Proposed section 553] sets forth a liability provision specifically applicable to theft of services offered over a cable system, while also providing specific criminal penalties and civil remedies for violations of the section ... The Committee intends the phrase 'service offered over a cable system' to limit the applicability of this section to theft of a service from the point at which it is actually being distributed over a cable system. Thus, situations arising with respect to the reception of services which are transmitted over the air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system. H.R.Rep. No. 934, 98th Cong., 2d Sess., at 83 (1984), reprinted in 1984 U.S.C.C.A.N. at 4720.

The court in *Noel* observed that this language "provides strong support for the view that Congress meant that while section 605 would continue to govern the theft of air-borne signals intended for redistribution via cable, section 553, and not section 605, would govern the theft of cable-borne signals." *Noel*, 859 F.Supp. at 76. Interpreted in the context of the entire report, however, the above language seems to be simply a reassurance that, while the new provision does not cover theft of air-borne signals, such theft is still covered elsewhere.

While disappointing and unsatisfying as an interpretive source, the legislative history does clearly indicate that, in 1984, Congress was particularly concerned with the sale of

unauthorized decoders. In their desire to protect the cable industry, they enacted new section 553 specifically to deal with that problem. At the same time, they confirmed that section 605 covered the same behavior. The result was an overlap between section 553 and section 605. While it may have been more sensible for Congress to make section 553 the exclusive remedy for the use and sale of unauthorized decoders, Congress clearly intended that section 605 would continue to prohibit that conduct.[4]

While legislative events in response to emerging technologies and other concerns may now suggest in hindsight a convenient and inviting sense of order, the temptation to revise earlier, sound interpretations because the Congress has more explicitly addressed certain areas of concern should be resisted. Congress may have now made clearer in section 553 their intent to sanction cable theft, but their earlier efforts remain applicable to the activities that are the subject of this case. The regrettable confusion and statutory morass that have emerged from Congress' well-intentioned efforts must be undone by the Congress, not the courts.

 In light of judicial precedent and the legislative history of the Cable Act of 1984, the Court holds that the term "radio communications" under section 605(a) includes cable-borne television signals. It is a violation of section 605(e)(4) to sell or distribute equipment knowing or having reason to know that such equipment is primarily of assistance in the unauthorized interception of cable-borne television signals. Accordingly, the defendants violated both section 605(e)(4) and section 553(a)(1) when they sold the decoders and combination units knowing that they would be used to intercept premium cable services without authorization.

Finally, the Court notes its agreement with Judge Curtin's conclusion in *Noel* that the unauthorized distribution of decoders intended for the descrambling of cable signals

does not run afoul of the initial proscription in section 605(e)(4) against the sale of equipment "primarily of assistance in the unauthorized decryption of *satellite cable programming*" (emphasis added). This conclusion, however, is not in this Court's view a matter of plain meaning as Cablevision and *Noel* each insist, while reaching opposite conclusions.

The language on its face is susceptible to two plausible interpretations. The first is that it covers only over-the-air satellite signals en route from the satellite station to the cable operator. The second is that it covers all video programming transmitted by satellite, received by cable operators and retransmitted over cable to subscribers, regardless of whether the programming is en route from the satellite station to the cable operators via air or en route from the cable operators to the subscribers via cable.

The legislative history of section 605 strongly suggests that Congress intended "satellite cable programming" to refer exclusively to over-the-air satellite signals. Significantly, Congress added the phrase "primarily of assistance in the decryption of satellite cable programming" to section 605(e)(4) as part of the Satellite Home Viewer Act, which was unquestionably designed to regulate the use of backyard satellite dishes.

 In light of the historical progression of section 605(e)(4), the Court construes the term "satellite cable programming" to encompass only air-borne signals, plaintiff's conclusory argument to the contrary notwithstanding.

## IV. *The Award of Statutory Damages*

 Upon full consideration of the evidence before the Court and pursuant to 47 U.S.C. § 605(e)(3)(C)(i)II, the Court awards statutory damages in the amount of $10,000 per violation.

---

4. The 1988 amendments increasing the penalties for violations of section 605 do not change this fact. Even though the legislative history of the Satellite Home Viewer Act indicates that Congress increased the penalties available under section 605 specifically in response to the problem of satellite piracy, section 605 nevertheless prohibits the unauthorized sale and use of decoders that descramble cable-borne signals as well. Therefore, the increased penalties apply to such activities as well as to piracy of air-borne signals.

### V. *Conclusion*

Cablevision is entitled to summary judgment for 390 sales of decoders and combination units. After full consideration of the surrounding facts and circumstances, the Court sets statutory damages in the amount of $10,000 per sale, totalling $3,900,000.

Cablevision shall recover from the defendants full costs and reasonable attorneys' fees as shall be determined by Chief Magistrate Judge Chrein.

Defendants are permanently enjoined from engaging in any business, transaction, occupation, or endeavor involving, directly or indirectly, the cable industry.

Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court directs the entry of a final judgment for the relief now granted, there being no just reason to delay entry of judgment.

SO ORDERED.