## COX CABLE CLEVELAND AREA, INC., Plaintiff,

v.

### Donald S. KING, a/k/a Donald L. Smith, a/k/a William L. Rodges, a/k/a William L. Rogers, d/b/a American HyTech and d/b/a Cleveland Cable Co., Defendant.

### No. C83–3604.

United States District Court,
N.D. Ohio, E.D.

Oct. 18, 1983.

Anthony F. LoFrisco, Breed, Abbott & Morgan, New York City, Barry L. Springel, Jones, Day, Reavis & Pogue, Cleveland, Ohio, James A. Hatcher, Atlanta, Ga., for plaintiff.

Joan B. Sebelin, Wessman, Simon & Sebelin, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

WHITE, District Judge.

This matter having come on for hearing on plaintiff's motion for preliminary injunction and the Court, having consolidated the hearing with a trial on the merits pursuant to Fed.R.Civ.P. 65(a)(2) and have heard the testimony of witnesses and arguments of counsel, makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Fed.R.Civ.P.

## FINDINGS OF FACT

The parties have stipulated to the first twelve numbered findings.

1. Plaintiff is a corporation organized and existing under the laws of the State of Ohio with its principal place of business at 12423 Plaza Drive, Parma, Ohio.

2. Defendant Donald S. King ("King"), whose real name is Donald L. Smith has used the other names of Don King, and William L. Rogers and is doing business as American Hy-Tech. Defendant resides and conducts business at 1821 Marloes Avenue, East Cleveland, Ohio. King has used and now uses other names, to wit, Donald L. Smith, William L. Rodgers, and William L. Rogers. Defendant is a citizen of the State of Ohio. The defendant's acts complained of have occurred and are occurring in the State of Ohio.

3. Plaintiff is in the business, among other things, of operating a cable television system in the Cleveland, Ohio area.

4. In order to provide cable television service, plaintiff has constructed facilities, which include a network of coaxial cable which starts at each individual subscriber's television set, feeds into a truck line and terminates ultimately at a local antenna of

plaintiff. Plaintiff's subscribers of premium programming view the premium channels by means of interstate through-the-air broadcasts received by plaintiff's centrally located antennas attached principally by cable to the subscriber's home television set.

5. Plaintiff operates its cable television system pursuant to authority granted by the localities of Rocky River, Parma, Parma Heights, Lakewood, Seven Hills, Fairview Park, Olmsted Falls, Olmsted Township, Broadview Heights, and Brooklyn Heights, all of which are localities in the Cleveland, Ohio area.

6. Plaintiff offers its paying subscribers two levels of service:

(a) "Basic Service consisting of:

(i) typical network television programs, local television programs and "super stations" (e.g. WOR in New York and Turner Broadcasting in Atlanta, Georgia), all of which can be received without the need of the usual rooftop antenna; and

(ii) local government, educational, informational (weather reports, stock market reports, and the like) and public access.

(b) "Premium Programming" consisting of special programming made available through Cox on four separate channels (19 through 22.)"

Premium Programming includes first run movies, special entertainment programs and other features not available to the general public by the television networks, super stations or other generally available television services. Plaintiff purchases Premium Programming from four suppliers, namely, Home Box Office, Cinemax, Playboy and Spotlight. Each of the four Premium Programming services are supplied to paying subscribers on a separate channel.

7. Plaintiff is authorized by each of the Premium Programming suppliers to provide the Premium Programming to those paying subscribers of plaintiff who pay an additional monthly fee for each Premium Programming channel selected.

8. Plaintiff is required to pay to each supplier of Premium Programming a portion of the applicable monthly subscription fee received by it.

9. Plaintiff supplies to each of its paying subscribers a device known as a "converter" or "converter/decoder," which enables a subscriber to receive intelligible signals on an ordinary television set when the device is connected between the subscriber's television set and the plaintiff's cable outlet.

10. Plaintiff specially adjusts its devices so that a paying subscriber will receive only the specific programming to which it has subscribed and no other.

11. The transmission of the Premium Programming supplied by Home Box Office, Cinemax, Spotlight and Playboy constitutes a common carrier transmission, (all of which originate outside of Ohio) via the Satcom F3 satellite, the Satcom F4 satellite and the Westar 5 satellite.

12. Defendant has advertised, offered for sale, and sold to the public one or more types of devices consisting of converters, converter/descramblers, converter/decoders, decoders and descramblers, including Oak Industries model M35B, which are capable of, used for and intended to be used for the unauthorized interception and reception of plaintiff's private signals, including the Premium Programming signals.

13. Defendant has sold Oak Industries M35B converter/decoders since at least March 1983, as follows: three in or about June 1983 and four or five additional in the period June 1983–August 1983 for a total of seven or eight or as many as ten from early 1983 to date. In addition defendant recommended to an undetermined number of potential purchasers, numbering between twenty and thirty, that they purchase M35B converter/decoder from another supplier, for which defendant was to receive a portion of the sales price as credit against equipment brought from the supplier.

14. Plaintiff arranges and pays for the reception of the interstate common carrier

transmission of the Premium Programming supplied by Home Box Office, Cinemax, Playboy and Spotlight, with the express intent that the transmissions are to be received only by persons who pay to subscribe to plaintiff's Premium Programming service. The plaintiff does not intend that the signals be received by the public at large.

15. Plaintiff's paying subscribers receive Premium Programming through interstate common carrier transmissions by means of the plaintiff's facilities, including the cable network installed by plaintiff.

16. In an attempt to avoid theft of its Premium Programming services, plaintiff scrambles its Premium Programming signals so that an ordinary television set will require a descrambler or decoder, among other things, to receive an intelligible signal.

17. An Oak M35B converting/decoder has a useful life of about seven to ten years.

18. When an unauthorized converter/decoder is connected to a purchaser's television set and plaintiff's cable facility, a purchaser can intercept all of the plaintiff's cable television programming, including Premium Programming signals which are intended solely for the paying subscribers and not for the general public.

19. Once defendant has sold an unauthorized converter/decoder it is virtually impossible for plaintiff to detect the purchasers' unauthorized use of the converter/decoder.

20. Plaintiff has made a substantial and continuing investment to bring Premium Programming to the Cleveland, Ohio area.

21. Under the terms of the authorizations granted to plaintiff by the localities in the Cleveland Ohio, area, the plaintiff is obliged to pay a portion of subscription fees to those localities.

22. Defendant is unable to identify any of the purchasers who bought M35B converter/decoders from him.

## CONCLUSIONS OF LAW

23. The jurisdiction of this Court is based on the existence of a federal question under 28 U.S.C. § 1331.

24. Section 605 of the Communication Act of 1934 ("the Act"), 47 U.S.C. § 605 protects radio communications (including television communications, see *Allen B. DuMont Laboratories v. Carrol*, 184 F.2d 153 (3rd Cir.1950), *cert. denied*, 340 U.S. 929, 71 S.Ct. 490, 95 L.Ed. 670 (1951)) from unauthorized reception, interception, publication or divulgence except where the broadcast is transmitted for the use of the general public. 47 U.S.C. § 605.[1] Subscription television, is not "a

---

1. Section 605, in full, reads as follows:

Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, content, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication or any part thereof or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. This section shall not apply to the receiving, divulging,

communication ... broadcast ... for the use of the general public" within the meaning of § 605 protecting radio communications from unauthorized reception. *Chartwell Communications Group v. Westbrook,* 637 F.2d 459 (6th Cir.1980).

25. The fact that the plaintiff's programming is transmitted in such a manner that the signal is meaningless without the use of special equipment i.e. converters or converter/decoders, negates a finding that it is intended for use of the general public. The transmissions of plaintiff's programming are private, and not intended to be received by the public at large, but rather are intended to be received only by such persons as are authorized by plaintiff. 47 U.S.C. § 605. *Movie Systems v. Heller,* 710 F.2d 492 (8th Cir.1983); *National Subscription Television v. S & H TV,* 644 F.2d 820 (9th Cir.1981); *Chartwell Communications Group v. Westbrook,* 637 F.2d 459 (6th Cir.1980).

26. Section 605 of the Act also prohibits, *inter alia,* any person not entitled thereto from receiving or assisting in receiving any interstate or foreign radio communication and using such communication for his own benefit or the benefit of another not entitled thereto. 47 U.S.C. § 605.

27. Defendant's advertisement, offer for sale, sale installation and use of devices capable of, used for, and intended to be used for unauthorized interception and reception of Premium Programming transmissions violates § 605 of the Act. *Movie Systems v. Heller,* supra; *National Subscription Television v. S & H TV,* supra; *Chartwell Communications Group v. Westbrook,* supra. See also *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.,* 467 F.Supp. 525 (E.D.N.Y.1979).

28. Plaintiff utilizes coaxial wire to enable subscribers to receive the protected signals. Section 605 prohibits the divulgement or publication of wire communications which are not intended for the general public. Defendant's activities "are assisting

third parties in receiving communications to which they are not entitled." *Chartwell Communications Group v. Westbrook,* supra, 637 F.2d, 466 quoted in *National Subscription Television v. S & H TV,* 644 F.2d 820 at 826. Defendant's activities in selling decoders to purchasers who use them for viewing plaintiff's signals constitutes a prohibited divulgement or publication within the meaning of § 605 of the Communications Act of 1934 as "the act of viewing a ... program on a television set equipped with an unauthorized decoder amounts to disclosure of the 'existence, contents, substance, purport, effect, or meaning' of ... signals to nonsubscribers. See 47 U.S.C. § 605." *National Subscription Television v. S & H TV,* supra, 644 F.2d 820 at 827.

29. The Sixth Circuit Court of Appeals has ruled that an aggrieved party has an implied private cause of action for injuries arising from § 605 violations of the Communications Act of 1934. *Chartwell Communications Group v. Westbrook,* supra. See also *Movie Systems, Inc. v. Heller,* supra; *National Subscription Television v. S & H TV,* supra.

30. A party seeking a preliminary injunction, must demonstrate:

(1) a substantial likelihood or probability of success on the merits;

(2) irreparable injury;

(3) that the issuance of a preliminary injunction would not cause substantial harm to others; and

(4) the public interest will be served by issuance of a preliminary injunction. *Friendship Materials, Inc. v. Michigan Brick, Inc.,* 679 F.2d 100, 103 (6th Cir. 1982).

31. The plaintiff has succeeded on the merits with respect to its claim pursuant to § 605 of the Communications Act of 1934. The defendant is engaged in a scheme to distribute, sell and advertise converter/de-

---

publishing, or utilizing the contents of any radio communication which is broadcast or transmitted by amateurs or others for the use

of the general public, or which relates to ships in distress.

coders which enable defendants' customers to steal Cox's cable television signal. This undermines Cox's method and purpose of doing business which is based principally on the collection of monthly fees from subscribers who pay for "premium" cable television programming. The activity of the defendant also threatens the contractual relations between Cox and its subscribers who continue to pay for their subscription cable service. Defendant's activities threaten to erode the base of Cox subscribers. Every sale of an unauthorized converter/decoder results in the irretrievable loss of potential or present Cox subscribers. The purchaser of an unauthorized converter/decoder from defendant is lost as a subscriber to Cox forever. See *Chartwell Communications Group v. Westbrook,* supra.

32. The continued viability of Cox's business depends upon the willingness of subscribers to pay a subscription fee for the premium programming. If equipment necessary to receive, convert and decode Cox's scrambled signals can be purchased from defendants without payment to Cox, the public will no longer see any advantage in paying Cox to obtain premium programs.

33. Defendant will not suffer if a preliminary injunction is issued. Even if defendant's primary business is the distribution and sale of equipment for stealing Cox's cable television programming, and even if defendant would be deprived of substantially all of his revenues if he is enjoined, the defendant has no vested right to earn money by violating the law. Defendant will suffer no harm if an injunction is issued which simply requires him to obey the law. *Home Box Office, Inc. v. Pay TV of Greater New York, Inc.,* 467 F.Supp. 525, 529 (E.D.N.Y.1979).

34. A preliminary injunction will also serve the public interest. First, Congress and the Courts have recognized and protected Cox's interest in cable television communications. See 47 U.S.C. § 605; *Chartwell Communications Group v. Westbrook,* supra.

Second, the municipalities and localities which have granted Cox the franchise to provide cable television service have a public interest in seeing that their right to franchise such service, is protected. Not only will an injunction protect a source of revenue for these municipalities and localities, but it also insures the quality of service and availability of service that the franchise agreements are intended to secure.

35. Third, individual members of the public, namely those subscribers to Cox who obey the law and do not utilize defendant's equipment to steal television signals have an interest in seeing that the subscriber base does not shrink and that they are not, consequently, forced to bear a disproportionate share of the costs of maintaining the local cable television system.

36. The plaintiff has also alleged an action for damages pursuant to 18 U.S.C. § 2520. Section 2520 provides that:

"Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter [Chapter 119] shall (1) have a civil cause of action against any person who intercepts, discloses, or uses, or procures any other person to intercept, disclose, or use such communications, and (2) be entitled to recover from any such person—

(a) actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher;

(b) punitive damages; and

(c) a reasonable attorney's fee and other litigation costs reasonably incurred. A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any civil or criminal action brought under this chapter or under any other law.

The plaintiff contends that the defendant's conduct violates 18 U.S.C. § 2511 which prohibits the interception and disclosure of wire or oral communications.

37. The Court is not persuaded that the plaintiff may pursue a cause of action pursuant to 18 U.S.C. § 2520.

38. The legislative history of 18 U.S.C. § 2510 *et seq.* reveals that this section is Title III of the Omnibus Crime Control and Safe Streets Act of 1968. See 1968 U.S. Code Cong. and Adm.News 2112. Title III of the Safe Streets Act was concerned with wiretapping and electronic surveillance by persons other than duly authorized law enforcement officials. The dual purpose of Title III was to protect the privacy of wire and oral communications i.e. telephone communications and to delineate the circumstances and conditions under which the interception of wire and oral communications may be authorized 1968 U.S.Code Cong. and Adm.News at 2153.

39. It is apparent from the legislative history of Title III that the Congress was concerned that the privacy of communication was being jeopardized by electronic surveillance. "Every spoken word relating to each man's personal, marital, religious, political or commercial concerns can be intercepted by an unseen auditor and turned against the speaker to the Auditor's advantage." *Id.* at 2154.

40. In order to remedy this "widespread use and abuse of electronic surveillance techniques," the Congress concluded that "[C]riminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provisions must be made for civil recourse for damages." *Id.* at 2156.

41. Hence the enactment of 18 U.S.C. § 2520. This Court is not persuaded however that the defendant's conduct in the matter sub judice, is within the ambit of conduct proscribed by 18 U.S.C. § 2510 *et seq.* With the exception of plaintiff's single principal case *Telecinema of Columbus, Inc., v. Tele-Tuner, Inc.*, case No. C–2–76–423 (S.D.OH 1976), cases brought under § 2520 were concerned with the "bugging" or "wiretapping" of telephones, and telephone conversation, use of pen registers, and other types of electronic *surveillance*. The activity common to these cases was a defendant's efforts to surreptitiously learn the contents of private, business or personal communications made over the telephone; not the unlawful interception of cable television programming.

42. The Court is persuaded that neither the defendant's conduct nor the wire communication here is within the ambit of 18 U.S.C. § 2520.

43. "Wire communication" is defined in 18 U.S.C. § 2510(1) as:

"Any communication made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connections between the point of origin and the point of reception furnished or operated by any person engaged as a common carrier in providing or operating such facilities for the transmission of interstate or foreign communications."

44. Section 2510(10) provides ... that the term communication common carrier shall have the same meaning as common carrier in 47 U.S.C. § 153(h). Section 153(h) of Title 47 defines common carrier as "... Any person engaged as a common carrier for hire in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy..."

45. The Supreme Court has determined that radio and television broadcasters are not included in the definition of common carrier under the Communications Act of 1934, as are telephone and telegraph companies. *United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 453, 3 L.Ed.2d 354 (1959). The Court also declined to view cable operators as common carriers when it ruled that the Federal Communications Commission could not regulate cable television systems as common carriers, just as it could not impose common carrier obligations on television broadcasters. *FCC v. Midwest Video Corporation*, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979).

46. In *Midwest Video Corp.*, supra the Supreme Court opined "[W]e think authority to compel cable operators to provide

common carriage of public-originated transmissions must come specifically from Congress." 440 U.S. at 709, 99 S.Ct. at 1446.

47. As the Supreme Court has declined to treat cable systems as common carriers subject to common carrier obligations and the plaintiff, has failed to show that it is a common carrier as used in 18 U.S.C. § 2510(1) or as defined in 18 U.S.C. § 2510(10) or 47 U.S.C. § 153(h), the Court is persuaded that the plaintiff does not transmit a "wire communication" as defined in 18 U.S.C. § 2510(1).

48. As the plaintiff is not a common carrier transmitting a 'wire communication' as defined in § 2510(1), the defendant's conduct is not within the purview of 18 U.S.C. § 2520.

ORDER AND JUDGMENT

WHEREFORE, it is ordered that:

1. The defendant, his agents, servants, employees, and those persons acting in concert with him, be and hereby are preliminarily and permanently enjoined until the further order of this Court from selling, offering for sale, advertising, leasing, filling orders, shipping, moving or transferring to any other location, installing or soliciting the installation of or otherwise disposing of any device including but not limited to converters, decoders, descramblers, converter/descramblers or converter/decoders which may be used for decoding, converting and/or intercepting in any manner whatsoever all or any part of the cable television services of Cox Cable Cleveland Area, Inc.

2. Costs to be assessed against the defendant.

IT IS SO ORDERED.