CENTURY—ML CABLE CORPORATION and Century—ML Cable Venture, Plaintiffs,

v.

Edwin F. CARRILLO DIAZ, et al., Defendants.

No. CIV. 98–1193(PG).

United States District Court, D. Puerto Rico.

May 11, 1998.

Francisco A. Besosa, Marshal D. Morgan, San Juan, PR, for Plaintiffs.

Vilma María Dapena, St. Bayamón, PR, Raymond L. Sánchez–Maceira, San Juan, PR, for Defendants.

## ORDER GRANTING PRELIMINARY INJUNCTION

PEREZ–GIMENEZ, District Judge.

The parties, Century–ML Cable Corporation and Century–ML Cable Venture (collectively "Plaintiffs") and Sandra Cardona ("Cardona") and Pedro Ríos ("Ríos") (collectively "Defendants"), having appeared at a hearing held before this Court on April 24, 1998 (the "Hearing"), and the Court having heard testimony and having received evidence presented by the Plaintiffs on the issues before it, and having heard arguments from both Plaintiffs and defendant Ríos on the related legal issues (defendant Cardona was present in Court, but declined to enter an appearance), does hereby issue and order the following Findings of Fact, Conclusions of Law, and Preliminary Injunction.

### FINDINGS OF FACT

Century–ML Cable Corporation, a/k/a Cable TV of Greater San Juan ("Cable TV"), is a cable television service provider with its principal place of business in San Juan, Puerto Rico. Century–ML Cable

Venture is a cable television provider with its principal place of business in Levittown, Puerto Rico. Plaintiffs operate and maintain their cable television systems pursuant to franchises awarded to them by various political subdivisions of the Commonwealth of Puerto Rico ("Puerto Rico") that authorize them to construct, operate and maintain cable television systems within parts of Puerto Rico. Plaintiffs offer cable television programming to subscribers who request and pay for such service. The services are offered to subscribers in various tiers of programming services. Basic service is a package of channels that a subscriber receives at a fixed monthly rate. Subscribers may also elect to purchase one or more "premium" programming services, such as Cinemax, Home Box Office, Showtime and The Movie Channel, for an additional monthly charge per service. Plaintiffs also offer Pay Per View programming, a service enabling subscribers to purchase individual movies, sporting events, or other entertainment for a per-event fee in addition to the subscriber's regular monthly subscription fee. Each subscriber is only entitled to receive that level of programming and services that he or she selects and purchases.

Plaintiffs receive their programming signals, most of which originate in the United States, via satellite signal transmissions at Plaintiffs' headend facilities. The signals are instantaneously retransmitted via networks of coaxial cable and/or fiber optic cable and transmitting equipment to subscribers' homes (the "Systems"). In order for a subscriber to receive these transmitted "nonbroadcast" cable television signals on his or her television set, the subscriber must either use a cable ready television or a device provided by plaintiffs known as a "converter." The converter transforms the multiple signals simultaneously transmitted over the Systems into different channels, which can then be viewed clearly on the subscriber's television set.

To prevent subscribers from receiving programming services for which they have not paid, Plaintiffs encode or "scramble" the signals for specific channel options. Subscribers purchasing scrambled channel options are provided with a device known as a "decoder" or "descrambler," which is incorporated into some converters. This device decodes the scrambled signals so that the programming selected and purchased can be viewed clearly on a subscriber's television set. Programming services not purchased, therefore, will continue to be scrambled and cannot be viewed on the subscriber's television set.

Encoding or "scrambling" is the primary security method employed by Plaintiffs (and most cable systems) to prevent subscribers from receiving programming services for which they have not paid. It is possible, however, for a dishonest individual to install an unauthorized or "pirate" decoder/converter unit or "descrambler" (one programmed to descramble all programming services) onto Plaintiffs' cable system in order to receive all of Plaintiffs' scrambled programming, without authorization and without payment for the programming. In most cases, Plaintiffs cannot detect or prevent the theft of their programming services from pirate descramblers without affirmative permission from a subscriber to conduct an on-site inspection.

The authorized converter-decoders provided by Plaintiffs to their subscribers each have the function and feature known as "addressability." An addressable converter-decoder is one which has its own individual electronic codification number, and when attached to the Systems, can communicate with Cable TV's central computer to authorize viewing only of programming services purchased by that subscriber. The feature and function of addressability is essential to the billing of Pay Per View programs. The reception of a Pay Per View program is authorized when a command is sent from a central computer of a System to the converter-decoder of the purchasing subscriber directing that device to decode the other-

wise scrambled picture of the Pay Per View program to be shown. A charge for the purchased Pay Per View program is documented and generated by the System's central computer only when the corresponding purchase order and authorization command for the viewing of a Pay Per View program are received and acted upon through the addressability function of the subscriber's converter-decoder.

There are a number of means by which persons attempt to modify converter-decoder devices to descramble and permit viewing of all programming services offered over a cable system. Mr. Jeffery Engleman, Plaintiffs' Management Information Systems Director, testified that one of the ways this can be accomplished is to "clone" the electronic codification number which is used in a converter-decoder box to decode and receive the programmed services and the Pay Per View events. The cloned codification number is then copied and inserted into numerous other converter-decoder boxes. Then, the converter containing the original codification number or master key is upgraded to receive the highest level of service, including all Pay Per View events offered (by calling the cable company to request receipt of all services). Once the System authorizes the master converter-decoder containing the original electronic codification number to receive all services, all modified converter-decoders containing clones of the master device will similarly be enabled to receive the same programming services and Pay Per View events.

### The Plaintiffs' Investigation of Defendants

The realization and discovery of the illegal cloning activities of defendants Cardona and Ríos arose as the result of a separate investigation that was begun in 1997. That investigation centered around the activities of co-defendant Edwin F. Carrillo Díaz, who, along with co-defendant Elliot López Piña, a/k/a/ Rafael López, has since consented to a permanent injunction in this action.

Mr. Engleman testified that, as part of his duties, he was charged with the responsibility of attempting to locate and identify people who might be pirating Plaintiffs' service. To do that, Mr. Engleman ran a search through Plaintiffs' central computer database looking for accounts which exhibited excessive and unusual Pay Per View purchasing patterns. Mr. Engleman stated that, in Mr. Carrillo's case, his Pay Per View purchases from Cable TV amounted to as many as three times the number of Pay Per View purchases as Cable TV's next highest purchaser of Pay Per View programming. Once Mr. Engleman received the results of the search for excessive Pay Per View purchasing, he then reviewed Mr. Carrillo's individual account in detail to analyze more closely his Pay Per View purchasing activity. A review of Mr. Carrillo's individual account revealed several specific instances of excessive and unusual Pay Per View purchases. For example, Mr. Carrillo purchased the same movie multiple times within the same month. *See e.g.*, Plaintiffs' Exhibit 2 ("Donnie Brasco" and "Fools Rush In" each purchased eight (8) times within one month). In addition, Mr. Carrillo's account also revealed that he had purchased different Pay Per View movies and/or special events on different channels at exactly the same time, or at overlapping times. Based on this excessive and unusual Pay Per View purchasing, therefore, Mr. Engleman suspected that Mr. Carrillo's account was acting as a master account in a Cable TV pirating scheme and was assisting in the unauthorized interception of Cable TV's service.

To test his theory, Mr. Engleman decided to interrupt Mr. Carrillo's Pay Per View signal in order to observe if it elicited any reaction from Carrillo or other unidentified subscribers who might be using clones of his device. On two separate occasions in November and December, 1997, Mr. Engleman interrupted Mr. Carrillo's Pay Per View service during two

highly publicized boxing matches. On both nights, Mr. Engleman waited until the main event had started before he interrupted the Pay Per View signal sent to Mr. Carrillo's converter-decoder. Immediately after each service interruption, several calls were received by Cable TV's customer service department regarding the Carrillo account. Mr. Engleman instructed the customer service representatives taking the calls to tell the caller that a service truck was in the area and that it could be sent to his home immediately to fix the problem. Each time this offer was made, it was rejected by the caller. In December, after Cable TV interrupted Mr. Carrillo's Pay Per View service for the second time, all Pay Per View activity on Mr. Carrillo's account ceased.

In February, 1998, Mr. Engleman again repeated his search for excessive and unusual Pay Per View activity. This time, another account, under the name of Sandra Cardona, appeared to exhibit the same type of Pay Per View purchasing activity as had the Carrillo account. Once Mr. Engleman accessed Ms. Cardona's individual account information, he noticed that at almost exactly the same time that the Pay Per View activity on the Carrillo account ceased, the excessive and unusual Pay Per View purchasing activity on the Cardona account had started. In addition, Mr. Engleman noted that Ms. Cardona's account activity showed multiple payments having been made during a single month. He explained that such multiple payments are another example of excessive Pay Per View purchasing because there is a maximum outstanding balance that one may have on his Pay Per View account. Therefore, in order to be able to purchase Pay Per View selections once the maximum has been reached, the balance must be continually paid down and kept below the maximum.

On February 6, 1998, Mr. Engleman sent an "Error # 1" signal to Ms. Cardona's converter-decoder, which essentially shut down her cable service. On February 9, 1998, the next business day, Ms. Cardona herself appeared at Cable TV's office, surrendered her converter-decoder and canceled her cable service altogether.

In the meantime, however, on Saturday, February 7, 1998, several other converter-decoders were turned in to Cable TV due to alleged damage. Mr. Engleman subsequently tested the Cardona converter, as well as the converters turned in on February 7, 1998, and found that several of the converter-decoders turned in on February 7 were actually clones of the Cardona converter-decoder. This was apparent because when such devices were attached to Plaintiffs' system, they responded to commands addressed to Cardona's device, rather than commands addressed specifically to them.

### The February 26, 1998 Ex Parte Order for a Temporary Restraining Order, Preliminary Injunction, Expedited Discovery, Asset Freeze, Accounting and Order of Seizure

Based on Plaintiffs' investigation, including the information discovered by Mr. Engleman, Plaintiffs sought, on an *ex parte* basis, and this Court entered, a temporary restraining order (the "February 26 Order"). The February 26 Order enjoined defendants Edwin F. Carrillo, Elliot López Piña, a/k/a Rafael López ("López"), and Sergio Strubbe Dávila ("Strubbe") (the husband of Sandra Cardona) from the further sale or modification of cable television equipment of any kind, and provided for expedited discovery and a freeze of those defendants' business and personal assets. The February 26 Order also directed that a seizure of all television decoding devices and business records and proceeds of decoder sales be conducted at Carrillo's and Lopez's residences by the United States Marshal Service. At this time, Cardona and Ríos had not yet been added as defendants.

On February 28, 1998, the United States Marshal Service executed seizures at the homes of Carrillo and López pursuant to the February 26 Order. At defendant

Carrillo's home, two (2) decoding devices were found, while at defendant López' home, four (4) decoding devices were found, along with information and records of possible clients of Carrillo's and Lopez's pirating business.

On March 3, 1998, two business days after the execution of the seizure order, defendant Ríos appeared at Cable TV's office and turned in both of his converter-decoders. A subsequent test of the decoding devices seized at the homes of defendants Carrillo and López revealed that one of the two devices found at Carrillo's home and all four of the devices found at López' home were clones of defendant Ríos' returned decoders. In fact, a test of the two Ríos decoders indicated that one of Ríos' decoders was a clone of the other.

At a hearing on March 9, 1998, defendants Carrillo and López consented to a permanent injunction and asset freeze, while defendant Strubbe failed to appear and the same relief requested was entered against him without opposition. On March 12, 1998, Plaintiffs filed an amended complaint adding Sandra Cardona and Pedro Ríos as defendants. On April 2, 1998, Plaintiffs filed a "Motion to Extend Temporary Restraining Order and Permanent Injunction to Newly Added Defendants." The Court then ordered defendants Cardona and Ríos to appear for the present Hearing and to show cause why a preliminary injunction should not be granted against them.

At the Hearing, Plaintiffs presented evidence, but the Defendants did not. Defendant Ríos did, however, argue at the close of Plaintiffs' presentation that because he turned in his two converter-decoders, Plaintiffs could not show that they have suffered or will suffer "irreparable harm" sufficient to satisfy the second of four requirements for a preliminary injunction set forth by the United States Court of Appeals for the First Circuit in *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996), *citing Weaver v.*

*Henderson*, 984 F.2d 11, 12 n. 3 (1st Cir. 1993).

## CONCLUSIONS OF LAW

This action arises under 47 U.S.C. §§ 605 and 553. This Court has jurisdiction over this action under 28 U.S.C. § 1331 and has supplemental jurisdiction over the common law constructive trust claim asserted in the complaint. 28 U.S.C. § 1367. Venue is properly established in the District of Puerto Rico pursuant to 28 U.S.C. § 1391(b).

Plaintiffs have proprietary rights in the cable programming services offered over their Systems. They are "persons aggrieved" by violations of the Communications Act and are thereby authorized to institute this action under 47 U.S.C. §§ 605(e)(3)(A) and/or 553(c)(1).

### *Preliminary Injunctive Relief*

### *Statutory Injunction*

Plaintiffs have moved for entry of preliminary injunctive relief under 47 U.S.C. §§ 553 and 605. These sections provide that a court may enter "permanent injunctive relief on such terms as it deems reasonable to prevent or restrain violations" of these statutes. 47 U.S.C. §§ 553(c)(2)(A) and 605(e)(3)(B)(i).

When express authority for issuance of "statutory" injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites of such relief. *See TKR Cable Co. v. Cable City Corp.*, No. 96–2877(GEB) 1996 WL 465508 at *10 (D.N.J. July 29, 1996)(Brown, J.); *Time Warner Cable of New York City v. Freedom Electronics, Inc.*, 897 F.Supp. 1454, 1460 (S.D.Fla.1995), *citing Burlington N.R.R. Co. v. Dep't of Revenue*, 934 F.2d 1064, 1074–5 (9th Cir.1991); *Securities Industry Assn. v. Board of Governors of Federal Reserve System*, 628 F.Supp. 1438 (D.D.C.1986).

Given the uncontested facts herein with respect to the Defendants' partic-

ipation in a cable television decoder modification or cloning scheme, the Court finds that the Plaintiffs are entitled to a preliminary injunction pursuant to 47 U.S.C. Sections 553(c)(2)(A) and/or 605(e)(3)(B)(i).

### Equitable Injunction

As the Plaintiffs have met the standard for issuance of a statutory injunction, it may not be necessary for them to demonstrate that they can satisfy the requirements of the First Circuit test for issuance of a preliminary injunction, *i.e.*, (i) the likelihood that the movant will prevail on the merits; (ii) the extent to which a potential for irreparable harm exists if the injunction is denied; (iii) that the balance of the relative impositions weighs in its favor, *i.e.*, that the harm to the movant if no injunction issues is greater than the harm to the non-moving party if the injunction does issue; and (iv) that a positive effect (if any) on the public interest is created by the court's ruling. *See e.g. Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996), *citing Weaver v. Henderson*, 984 F.2d 11, 12 n. 3 (1st Cir.1993).

■ Even if Plaintiffs' satisfaction of the traditional equitable standards were required, however, the Court finds that the necessary showing with respect to each has been made. The Plaintiffs have clearly demonstrated a likelihood of success on the merits of their claims, both with respect to controlling case law (*see* herein), and the undisputed facts regarding Defendants' pirate converter-decoder cloning and distribution operation.

■ With respect to irreparable injury, the Court notes that where the party against whom the relief sought has violated a statute, only a bare minimum showing (if any) of irreparable harm is required before a court may issue injunctive relief. *See TKR Cable Co.*, 1996 WL 465508 at *10; *Freedom Electronics*, 897 F.Supp. at 1460 ("[S]everal federal courts have held that absence of justification for violation of

clear statutory rights virtually eliminates the necessity of showing irreparable harm"); *Home Box Office, Inc. v. Pay TV of Greater New York*, 467 F.Supp. 525, 529 (E.D.N.Y.1979) ("where a Defendant shows no justification for continuing to violate a Plaintiff's clear statutory rights, there is no reason to withhold preliminary relief even without a showing of the same quantum of 'irreparable' damages as would be required where Plaintiff's ultimate success was more doubtful").

At the Hearing, Mr. Engleman described how Plaintiffs would suffer irreparable harm absent issuance of an injunction. He testified as to the loss of revenue and subscribers resulting from the cloning of decoding devices and the practical inability of Plaintiffs to detect cloned converter-decoder devices, so as to eliminate the loss of revenue resulting from them. Numerous reported decisions hold that this constitutes irreparable harm necessary to satisfy this prong of the equitable injunction test. *TKR Cable Co.*, 1996 WL 465508 at *10, *citing Storer Communications v. Mogel*, 625 F.Supp. 1194, 1202 (S.D.Fla.1985) ("Defendant's conduct causes irreparable harm because Plaintiff's ability to retain existing subscribers, to enlist new subscribers, to acquire suitable programming and to remain in the cable business depends directly on their reputation as the sole source of the cable programming that Plaintiff provides"); *Cox Cable Cleveland Area v. King*, 582 F.Supp. 376, 381 (N.D.Ohio 1983). *See also Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir.1994) ("[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied"); *S & R Corp. v. Jiffy Lube Intern., Inc.*, 968 F.2d 371, 374 (3d Cir.1992) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of good will").

During the Hearing, defendant Ríos raised the argument that because he had turned in the two converter devices in his possession (one of which had served as a master account for an unknown number of other converter devices), the damages to Cable TV had ceased and therefore were not irreparable. This argument is simply not supported by the evidence presented at the Hearing or by the Court's interpretation of this standard of the preliminary injunction test. As explained by Mr. Engleman, Ríos and Cardona turned in their converters shortly after the seizure, when it became apparent that Cable TV had learned of defendants Carrillo's, Lopez's, and Strubbe's involvement in a cloning scheme, and apparently in an effort to avoid being connected with the cloning scheme. The Court finds that this does not mean that Plaintiffs are no longer suffering damages as a result of their actions, or that Plaintiffs will not suffer damages in the future absent an injunction.

Mr. Engleman's testimony demonstrated that, even after defendants Ríos and Cardona returned their converters, those persons who had previously received cloned devices from the Defendants could still receive Cable TV's premium and Pay Per View services without payment if they knew when to disconnect their converter boxes for brief periods of time. Supported by such evidence, the Court finds that although Ríos and Cardona turned in the converters in their possession, Plaintiffs are still suffering damages from the Defendants' pirating scheme.

Furthermore, even assuming, *arguendo*, that the surrender of the converter boxes could put an end to Plaintiffs' continuing to suffer damages with respect to the clones from Ríos' and Cardona's master accounts, the Plaintiffs have already suffered irreparable harm, in the form of lost revenues and subscribers, from the Defendants' actions. Due to the fact that the precise quantity of damages suffered by them may be difficult or impossible to calculate, the Plaintiffs lack an adequate remedy at law

for Defendants' acts. *TKR Cable Co.*, 1996 WL 465508 at *11; *Freedom Electronics*, 897 F.Supp. at 1460 ("[T]he plaintiff suffers irreparable harm from each converter-decoder device which one of plaintiff's subscribers purchases from defendants"); *Subscription Television of Greater Washington v. Kaufmann*, 606 F.Supp. 1540, 1546 (D.D.C.1985); *Porter County Cable Co. v. Moyer*, 624 F.Supp. 1 (N.D.Ind. 1983).

Finally, it should also be noted that, absent an injunction, there is no guarantee that Rios or Cardona will not continue to assist in the unauthorized interception of services offered over Cable TV's System in violation of the Communications Act, causing further irreparable harm.

A balancing of the parties' respective hardships reveals that the injunction means only that Defendants will be enjoined from conducting a business which is prohibited by federal law. *See e.g., TKR Cable Co.*, 1996 WL 465508 at *11; *Storer Communications*, 625 F.Supp. at 1203 ("The alleged illegal activities of the defendant are not worthy of any protection ... Defendant has no vested right to earn money by violating the law ... Defendant will suffer no harm if an injunction is issued which simply requires them to obey the law."). *See also ON/TV of Chicago v. Julien*, 763 F.2d 839, 844 (7th Cir.1985); *Freedom Electronics*, 897 F.Supp. at 1460; *Cox Cable*, 582 F.Supp. at 381. The fact that such a pirating scheme, enabling the theft of Cable TV's signals in exchange for payment to the Defendants, is clearly illegal has to date not served as a sufficient deterrent to Defendants. On the other hand, as noted in the Court's analysis of irreparable harm, the sale of these devices levels continuing irreparable harm upon Cable TV's business integrity and revenues. Therefore, the balance of hardships in this case leans considerably towards Plaintiffs' request for a preliminary injunction.

The fourth and final consideration that must be addressed by this Court in mak-

ing its determination is whether the granting of the preliminary injunction would in any way disserve the public interest. The Court finds that the illegal modification and/or distribution of cable television decoding devices with the intent that they be used for the unauthorized interception of programming services without payment of subscription fees constitutes conduct which is criminal in nature, and the public's interest in preventing such conduct is evident. *See Securities Indus. Ass'n. v. Board of Governors of Federal Reserve System,* 628 F.Supp. 1438, 1443 (D.D.C. 1986) (in cases where injunctive relief is sought to prevent continuing violations of federal statutes, "the equities to be balanced are not simply those of the private litigants, but also the interests of the public as defined by Congress"). *See also Cox Cable Cleveland Area,* 582 F.Supp. at 381 ("Congress and the Courts have recognized and protected Cox's interest in cable television communications").

Numerous other courts have also noted that the entry of an injunction against Defendants' continued sale and distribution of unauthorized cable television decoding devices does not harm and, in fact, will promote the public interest. *See, e.g., TKR Cable Co.,* 1996 WL 465508 at *11 (noting that cable piracy undermines intellectual property rights of creators and owners of stolen programming); *Freedom Electronics,* 897 F.Supp. at 1460 (noting that cable piracy may result in FCC-prohibited "signal leakage" and creates an unfair subsidy to "freeloaders"). *See also Storer Communications,* 625 F.Supp. at 1203 (noting loss of franchise fees to municipalities from cable piracy); *Cox Cable,* 582 F.Supp. at 381 (noting that lost cash flow to cable operators adversely affects their ability to purchase and maintain a higher quality of programming services for their subscribers).

### Continuance of Asset Freeze

■ With respect to Defendants' argument that the continued freeze of their personal, as well as their business, assets

is improper, the Court notes that Defendants have made no accounting or other showing that their assets were derived from legitimate conduct, as required by the TRO, which required that Defendants disclose their assets and provide an accounting with respect thereto. *See* 47 U.S.C. §§ 605(e)(3)(c)(i)(I) and 553(C)(3)(A)(i), which state that defendants shall be required to account for profits resulting from violations of the statutes.

As such, the Court believes that Defendants' arguments are premature, and that compliance with the order is necessary for a determination to be made as to whether any assets subject to the restraint on transfers are a product of Defendants' business. Given the extent of the cable television piracy shown by the Plaintiffs, and not disputed by the Defendants, the Court finds that the continuation of such asset freeze is warranted to ensure Plaintiffs ability to avail themselves of equitable-type relief provided for in 47 U.S.C. § 605(e)(3)(C)(i)(I) and/or § 553(c)(3)(A)(i). *See e.g., TKR Cable Co.,* 1996 WL 465508 at *11; *Freedom Electronics,* 897 F.Supp. at 1460–61; *Time Warner Cable of New York City v. M.D. Electronics, Inc.,* 101 F.3d 278, 279 (2d Cir.1996)(referencing district court's grant of asset freeze); *Hoxworth v. Blinder, Robinson & Co., Inc.,* 903 F.2d 186, 197 (3rd Cir.1990) (continuing restraint on assets until legitimate source is shown); *Levi Strauss & Co. v. Sunrise Intern., Trading Inc.,* 51 F.3d 982, 987 (11th Cir.1995) (preliminary relief, including asset freeze, is appropriate to assure availability of equitable-type relief); *Reebok Intern., Ltd. v. Marnatech Enterprises, Inc.,* 970 F.2d 552, 559 (9th Cir. 1992) (prejudgment asset freeze is an appropriate exercise of a district court's inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief).

### PRELIMINARY INJUNCTION

Pursuant to the foregoing, it is hereby:

ORDERED, that the terms of the TRO are hereby modified and merged into the following Preliminary Injunction Order:

ORDERED, that the Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled directly or indirectly by Defendants or action on Defendants' behalf, are hereby enjoined and restrained from the sale, transfer, advertisement, and/or offer for sale, modification, manufacture, storage, and distribution of cable television Decoding Devices, as described herein, and related equipment and/or the rendering of any assistance whatsoever in the sale, transfer, advertisement, modification, manufacture, storage or distribution of such equipment, with such equipment including but not limited to cable television decoders, converters (if modified so as to be capable of decoding scrambled cable transmissions or if connected to other decoding equipment described herein), descramblers, descrambling cubes or "programmers," converter-decoder combination units, integrated circuits, quick boards, smart boards, test kits, chips, cloned electronic keys, E proms, and circuit boards, (hereinafter "Decoding Devices"); and it is further

ORDERED, that the Defendants, their agents, employees, affiliates and any business entities and/or persons controlled by them or acting on their behalf or acting in concert with them, are hereby restrained and enjoined from destroying, altering, removing or secreting any of the Defendants' books and records, including but not limited to invoices, purchase orders, receipts, banking records, safe deposit box records, investment records, shipping labels, tax returns, including all records stored on computer diskettes or tapes or within computer terminals or otherwise, which contain any information whatsoever concerning the business or finances of any of cable television, the Defendants' or otherwise reflect any transactions of any kind involving Decoding Devices, and related equipment; and it is further

ORDERED, that the Defendants, their agents, employees, affiliates, and any business entities and/or persons controlled by them, or acting on their behalf or acting in concert with them, and any persons or other entities having joint ownership of assets with them, are hereby restrained from transferring, removing, encumbering or permitting the withdrawal of any assets or property, presently or formerly belonging them, jointly or severally, whether real or personal, tangible or intangible, including but not limited to cash, bank accounts of any kind, stock and bond accounts and title to Defendants' business property; and it is further

ORDERED, that the Defendants shall, by May 15, 1998 at 10:00 a.m., comply with the TRO and produce at the office of Plaintiffs' counsel the following:

1. Any computers, diskettes or computer tapes used by Defendants in their decoder modification and sales business; and

2. Any and all other business records as set forth in the TRO, including but not limited to client lists, regarding the Defendants' decoder modification business, and

3. Written identification of all of their assets, whether individually or jointly owned with others, and it is further

ORDERED, that Defendants' failure to comply with the preceding provisions shall immediately subject them to this Court's contempt power, with the possible contempt sanctions including imprisonment until compliance is completed and monetary sanctions, and it is further

ORDERED that defendant Cardona shall appear at Plaintiffs' counsel's office on May 18, 1998 at 10:00 a.m. for her deposition in this action, and it is further

ORDERED that defendant Ríos shall appear at Plaintiffs' counsel's office on May 18, 1998 at 2:00 p.m. for his deposition in this action, and it is further

ORDERED that within thirty days after the entry of this Order, the parties shall report to the Court the status of their settlement negotiations regarding money damages and the Court may at that time either extend the time for such negotiations or set the matter down for hearing or trial, and it is further

ORDERED that this Order does not modify or supercede the Permanent Injunction previously entered by this Court with respect to defendants Edwin F. Carrillo Diaz, Elliott López Piña, and Sergio Strubbe Dávila.

IT IS SO ORDERED.